PINNEY DOCK & TRANSPORT
COMPANY, Plaintiff,

v.

PENN CENTRAL CORPORATION, et
al., Defendants and Third-Party
Plaintiffs,

v.

CONSOLIDATED RAIL CORPORA-
TION, Third-Party Defendant.

No. C80–1733.

United States District Court,
N.D. Ohio, E.D.

June 21, 1983.

On Reconsideration March 20, 1984.

Richard T. Colman, William T. Garcia, Howrey & Simon, Washington, D.C., Harry C. Nester, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, for Pinney Dock.

John Doar, John Doar Law Offices, New York City, Stephen J. Pollak, Richard T. Conway, Shea & Gardner, Washington, D.C., Roland W. Donnem, Sr. Vice President—Law, Charles C. Rettberg, Jr., Cleveland, Ohio, for Chessie (C & O, B & O, Ohio Ry. Chessie Syst. and CSX).

Richard J. Flynn, Stephen S. Hill, Thomas H. Yancey, Sidley & Austin, Washington, D.C., Byron D. Fair, Arter & Hadden, Cleveland, Ohio, Richard W. Kienle, Roanoke, Va., for Norfolk & Western.

Kenneth C. Anderson, Sean Boland, Timothy W. Bergin, Squire, Sanders & Dempsey, Washington, D.C., Eben G. Crawford, Squire, Sanders & Dempsey, Cleveland, Ohio, for Bessemer & Lake Erie; John D. Morrison (Gen. Counsel), William C. Leiper, Monroeville, Pa., of counsel.

Kenneth N. Hart, Donovan, Leisure, Newton & Irvine, New York City, Carl L. Steinhouse, Stephen Squeri, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Robert J. Siverd, New York City, for Penn Cent.

Myron N. Krotinger, Burke, Haber & Berick, Cleveland, Ohio, Laurence Z. Shiekman, Sylvia Brown, Robert E. Heideck, Richard M. Bernstein, Pepper, Hamilton & Scheetz, Bruce B. Wilson, Philadelphia, Pa., for Consolidated Rail.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

In separate but related motions filed on April 15, 1982, defendants Baltimore & Ohio Railroad Company (B & O), Chesapeake & Ohio Railway Company (C & O), CSX Corporation, Chessie Systems, Inc. (sometimes collectively referred to as Chessie), Norfolk & Western Railway Company (N & W), and Bessemer & Lake Erie Railroad Company (B & LE) move to dismiss plaintiff Pinney Dock & Transport Company's (Pinney) complaint seeking damages for alleged

> injuries to plaintiff's business and property caused by defendants' violations of

sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, section 3 of the Clayton Act, 15 U.S.C. § 14 ... and Ohio's Valentine Act.[1]

Each defendant argues that the alleged activities underlying plaintiff's claims are expressly and impliedly immunized from the antitrust laws by the Interstate Commerce Act (ICA), and that the Interstate Commerce Commission (ICC) has exclusive jurisdiction over the substance of plaintiff's claims. Each defendant additionally asserts that plaintiff's treble damage claims are barred by the doctrine of *Keogh v. Chicago & Northwestern Ry.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Defendant B & LE further contends that certain of plaintiff's claims should be dismissed either for lack of standing or "because they could not as a matter of law have caused direct or cognizable injury to plaintiffs." Finally, each defendant asserts that if this court does not dismiss plaintiff's complaint, "the case should be referred to the ICC under the doctrine of primary jurisdiction."

Since each of the parties has submitted factual exhibits in arguing the various issues, the court will apply Rule 56 of the Federal Rules of Civil Procedure's summary judgment standards. Defendants' motions will be granted only if "there is no genuine issue as to any material fact and [defendants are] entitled to a judgment as a matter of law."

Before analyzing the various branches of defendants' motions, it is essential to review the principal allegations in this antitrust case.

Plaintiff, an Ohio corporation, provides dock and terminal services in Ashtabula, Ohio for goods moving over the Great Lakes. In its first amended complaint, plaintiff alleges that "from at least the mid-1950's" the defendants conspired and acted to monopolize "the business of providing dock services for iron ore and other goods moving over docks on the lower

---

1. The court does not address the related motion of defendant Penn Central Corporation at this time. See this court's memorandum and order of November 9, 1982.

Great Lakes, and the business of providing land transportation for iron ore and other goods moving over such docks." Plaintiff further alleges that defendants concomitantly conspired and acted to "restrain trade in the business of providing water carriage for iron ore and other goods moving over docks on the lower Great Lakes, and in the business of building ships for such carriage."

Plaintiff asserts that defendants advanced the ends of the alleged conspiracy through a series of overt acts and practices, some of which are specifically set forth in the first amended complaint. The alleged overt acts include refusing to grant a competitive rail rate for the carriage of iron ore from Pinney Dock, arbitrarily placing Pinney Dock in a switching district where it was ineligible for competitive rail rates, and imposing unjustifiably high switching charges on the cars of a railroad competitor which sought to carry iron ore from Pinney Dock at competitive rail rates. Defendants are additionally accused of "deliberately and purposefully foreclosing Pinney Dock's development as an iron ore handling facility by ... preventing and postponing the construction and use of the self-unloading vessels which Pinney Dock was designed to serve."

Plaintiff maintains that the above alleged overt acts and practices (and others) were planned and carried out through a series of unauthorized secret meetings and discussions and that coercion and intimidation were used to

(1) [force] railroads to forego their right of independent action with respect to rail rates and services and other matters;

(2) [force] railroads not to serve self-unloading vessels at railroad-owned docks; and

(3) [force] railroads not to lower their dock handling charges on iron ore.

Plaintiff charges that defendants' alleged antitrust violations have effectively stifled technological progress and development in the construction and use of efficient dock facilities and vessels and impeded and prevented the development of non-rail modes of land transportation. Additional effects allegedly resulting from the charged conspiracy are: (1) that shippers were subjected to artificially and unjustifiably high rates and charges for dock and land transport services; and (2) that needed improvements in the efficiency, economy and competitiveness of dock and transport facilities were subverted.

Plaintiff further states that

[a]s a direct and proximate result of the foregoing acts and violations, [plaintiff] has been greatly injured in its business and property because it was forestalled and excluded from participating in the business of providing dock services for various commodities, including iron ore, coal, and coke.

Plaintiff seeks treble damages under the federal antitrust laws and an order enjoining defendants from further violations of the federal and state antitrust laws.

I.

The court first addresses defendants' separate but parallel contentions that "the complaint should be dismissed because the matters at issue are within the exclusive jurisdiction of the Interstate Commerce Commission." Defendants argue that the Interstate Commerce Commission's pervasive regulation of railroad ratemaking activities supersedes the federal antitrust laws as to all "matters concerning the establishment of railroad rates." More precisely, defendants contend that the existence of the Interstate Commerce Act impliedly immunizes them from plaintiff's present antitrust action.

In support of their argument, defendants point out that the Interstate Commerce Act seeks to substitute collective action among the railroads under the supervision of the Interstate Commerce Commission for unrestrained competition between the railroads. Without question, the nature of the railroad industry necessitates collective action among competing carriers. For example, it is frequently necessary for one railroad to deliver freight to a destination located on the tracks of a competitor. Thus, under 49

U.S.C. § 1(4), the railroads are required to "provide and furnish transportation upon reasonable request therefore, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto...." Similarly, 49 U.S.C. § 1(10) and (11) mandate that the railroads establish reasonable rules with respect to the interchange of locomotives, rail cars, and other railroad property.[2]

However, despite the need for cooperation between the railroads and notwithstanding the ICC's oversight of that cooperation, the Interstate Commerce Act does not necessarily provide an impermeable shield of implied immunity from the antitrust laws for the railroad industry. In *Gordon v. New York Stock Exchange*, 422 U.S. 659, 682–83, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975), the Supreme Court quoted language which has been oft repeated in the context of antitrust cases involving regulated industries:

> Certain axioms of construction are now clearly established. Repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied....

With that language in mind, the court turns to the relevant case law.

In *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), the state of Georgia filed an antitrust suit against approximately 20 railroad companies[3] alleging that the defendants conspired to fix railroad rates so as to discriminate against the state of Georgia and that the defendants used coercion in the fixing of discriminatory joint through rates. After examining selected provisions of the

Interstate Commerce Act, including 49 U.S.C. §§ 1(4) and 6, the Court addressed the defendants' contention that the ICC had exclusive jurisdiction over railroad rate cases. Unequivocally emphasizing that the railroads were "subject to the antitrust laws," *id.* at 456, 65 S.Ct. at 725, the Court observed that "conspiracies among carriers to fix rates were included in the broad sweep of the Sherman Act" and that Congress had never adopted legislation legalizing rate-fixing combinations. Failing to find a "clear repugnancy" between the Sherman Act and the Interstate Commerce Act, the Court left it to Congress to statutorily create any antitrust immunity which the railroad industry needed to function efficiently.

Similarly, in *Carnation Co. v. Pacific Conference*, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), defendant shipping conferences argued that the Shipping Act "repealed all antitrust regulation of the rate-making activities of the shipping industry." Finding that the defendant associations of shipping companies' unlawful rate-making activities were not expressly immunized from Sherman and Clayton Act coverage by section 15 of the Shipping Act, 46 U.S.C. § 814, the Court continued:

> We do not believe that the remaining provisions of the Shipping Act can reasonably be construed as an implied repeal of all antitrust regulation of the shipping industry's rate-making activities ... we have long recognized that the antitrust laws represent a fundamental national economic policy and have therefore concluded that we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust

---

2. The Interstate Commerce Act, 49 U.S.C. § 1, *et seq.*, was recodified in 1978 as 49 U.S.C. § 10101, *et seq.* While that recodification was not intended to make any "substantive change in the law" (see section 3(a) of P.L. 95–473, 92 Stat. 1466), it extensively revised the structure and language of the Act. Moreover, beginning in 1976, Congress made substantive changes in the Act culminating in the Staggers Rail Act of 1980, 94 Stat. 1895. This court will cite to the

pre-1978 version of the ICA since its provisions were in effect during most of the period covered by the complaint.

3. The suit was filed in Georgia's capacity as both *parens patriae* and as a proprietor to redress wrongs suffered by the state as the owner and operator of various other state institutions.

laws wholly inapplicable to that industry. We have, therefore, declined to construe special industry regulations as an implied repeal of the antitrust laws even when the regulatory statute did not contain an accomodation provision such as the exemption provisions of the Shipping and Agricultural Acts.

*Id.* at 217–18, 86 S.Ct. at 784. The Court further observed that the express immunity language inserted into the Shipping Act by Congress

> must have been selected as a matter of deliberate choice in order to indicate the extent to which the industry's rate-making activities remain subject to the antitrust laws as well as the extent to which those activities are exempted from antitrust regulation.

*Id.* at 219–20, 86 S.Ct. at 785.

■ As with the Shipping Act, Congress has written an express immunity provision into the Interstate Commerce Act. Recognizing the need for cooperative activity among the railroads and responding in part to the Court's decision in *Georgia v. Pennsylvania R. Co., supra,* Congress in 1948 amended the Interstate Commerce Act by adding 49 U.S.C. § 5b. See H.R.Rep. No. 1100, 80th Cong., 2nd Sess. 1845–1848, reprinted in 1948-2 U.S.Code Cong. & Ad. News 1844. Under section 5b, rail carriers are permitted to reach agreements as to rates, fares, classifications and a number of other railroad matters. 49 U.S.C. § 5b(9) provides that the railroads are "relieved from the operation of the antitrust laws with respect to the making of such [an] agreement and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the [Interstate Commerce] Commission."

This court concludes that the "pervasive regulation of railroad ratemaking activities by the Interstate Commerce Commission" does not impliedly immunize all railroad ratemaking activities from the antitrust laws. Any immunity which the defendants can invoke in this case must be found in the Interstate Commerce Act's express grant of antitrust immunity. To the scope and breadth of that immunity, attention is now turned.

## II.

### A.

Defendants argue that plaintiff's antitrust allegations are based upon coordinated ratemaking activities which were conducted in accordance with a joint ratemaking agreement expressly approved by the Interstate Commerce Commission. Defendants contend that their joint ratemaking activities are expressly immunized from the antitrust laws by section 5a of the Interstate Commerce Act, as amended by the Reed-Bulwinkle Act, 49 U.S.C. § 5(b) (1948).

49 U.S.C. § 5b(9) expressly authorizes certain agreements between competing railroads relating to rates, classifications, and other transportation matters. The section also allows the participating railroads to establish rules, regulations, and procedures for the joint consideration and implementation of rate schedules and classification systems, etc. When an agreement under this section is approved by the ICC, the participating railroads are expressly immunized

> from the operation of the antitrust laws with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission.[4]

4. 49 U.S.C. § 5b(2) sets the standard for ICC approval of an agreement among rail carriers:

Application to Commission for approval of agreements; rules and regulations

(2) Any carrier party to an agreement between or among two or more carriers relating to rates, fares, classifications, divisions, allow-

ances or charges (including charges between carriers and compensation paid or received for the use of facilities and equipment), or rules and regulations pertaining thereto, or procedures for the joint consideration, initiation or establishment thereof, may, under such rules and regulations as the Commission

■ Defendants in this case have jointly participated in a formal ICC approved eastern railroads rate bureau agreement since 1950. See *Section 5a Application No. 3, Eastern Railroads-Agreements,* 277 I.C.C. 279 (1950). Since the ICC approved agreement has (with minor modifications not relevant to this case) been in effect throughout the period of the alleged conspiracy, defendants argue that any rate actions they took which affected either Pinney Dock or iron ore traffic in general fell within the scope of section 5b(9)'s express grant of antitrust immunity. In response, plaintiff Pinney contends that defendants' conduct is not expressly immune under the Reed-Bulwinkle Act. Plaintiff urges that [t]he group boycott charged in this case is not protected by the Reed-Bulwinkle Act and is unapprovable by the ICC. Section 5a [49 U.S.C. § 5b] does not immunize conspiracies which have the purpose and effect of eliminating a competitor.

In determining whether the activities of defendants alleged by the plaintiff fall within the scope of section 5b(9)'s express grant of antitrust immunity, this court's analysis must commence with a study of the statute itself.

### B.

Defendants maintain that their argument is supported by the "statutory language." This court, however, reads that statute's language differently than defendants. Certainly, the making of the Eastern Railroads Agreement approved by the ICC in 1950 is immunized from the reach of the antitrust laws by 49 U.S.C. § 5b(9). Nonetheless, the issue confronting this court is whether the ICC's approval of the defendants' basic 5a agreement operates as either an express or implied approval of a later

may prescribe, apply to the Commission for approval of the agreement, and the Commission shall by order approve any such agreement (if approval thereof is not prohibited by paragraph (4), (5), or (6) of this section) if it finds that, by reason of furtherance of the national transportation policy declared in this Act, the relief provided in paragraph (9) of this section should apply with respect to the making and carrying out of such agreement; otherwise the application shall be denied. The approval of the Commission shall be granted only upon such terms and conditions as the Commission may prescribe as necessary to enable it to grant its approval in accordance with the standard above set forth in this paragraph.
49 U.S.C. § 5b(9), the express immunity provision, provides in full:
 Relief from operation of antitrust laws
 (9) Parties to any agreement approved by the Commission under this section and other persons are, if the approval of such agreement is not prohibited by paragraph (4), (5), or (6) of this section, relieved from the operation of the antitrust laws with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission.
 The validity of the ICC approved *Eastern Railroads—Agreements, infra,* is not at issue in this case. Thus, none of the prohibitions in paragraphs (4), (5), and (6) set out below are claimed or found to be applicable. However, the plaintiff is not precluded from arguing that defendants agreed to forego their rights of independent action in violation of their agreement as part of a conspiracy to eliminate competition.
 Agreements between carriers of different classes
 (4) The Commission shall not approve under this section any agreement between or among carriers of different classes unless it finds that such agreement is of the character described in paragraph (2) of this section and is limited to matters relating to transportation under joint rates or over through routes; and for purposes of this paragraph carriers by railroad, express companies, and sleeping-car companies are carriers of one class; pipe-line companies are carriers of one class; carriers by motor vehicle are carriers of one class; carriers by water are carriers of one class; and freight forwarders are carriers of one class.
 Pooling or division agreements
 (5) The Commission shall not approve under this section any agreement which it finds is an agreement with respect to a pooling, division, or other matter or transaction, to which section 5 of this title is applicable.
 Agreements for determining matters through joint consideration
 (6) The Commission shall not approve under this section any agreement which establishes a procedure for the determination of any matter through joint consideration unless it finds that under the agreement there is accorded to each party the free and unrestrained right to take independent action either before or after any determination arrived at through such procedure.

"agreement" to eliminate a competitor and monopolize a market. Nothing in the actual language of section 5b(9) set forth earlier either suggests that it does or permits that implication.

Nonetheless, defendants argue that apart from the language of section 5b(9), "the structure of section 5a suggests that there is no need to create a predatory intent exception because such complaints are covered by the ICC's regulation." In support of this argument, defendants correctly observe that under 49 U.S.C. § 5b(2) the ICC only approves those "agreements" which are "in furtherance of the national transportation policy." However, nothing in the present record indicates that the ICC ever "approved" or even was aware of defendants' alleged predatory conspiracy to boycott and eliminate plaintiff as a competitor. The 1950 Eastern Railroads Agreement, which merely establishes the procedures for discussing rate matters and reaching rate agreements, cannot be read as impliedly or expressly "approving" such a predatory conspiracy.

 In an attempt to bolster their "structure" argument, defendants note that under 49 U.S.C. § 5b(7) the ICC is authorized to investigate and determine whether any agreement it has approved conforms with the terms and conditions upon which its approval was earlier granted. Moreover, the ICC can modify or terminate an existing agreement where necessary.[5] But the conformance of the Eastern Railroads Agreement of 1950 to the ICC's requirements is not an issue in this case. The issue is whether defendants illegally conspired to boycott and eliminate a direct competitor so as to monopolize a market. Nothing in the structure of the Interstate Commerce Act suggests that the ICC can approve such a conspiratorial agreement,[6] or provide a remedy under the antitrust laws for the damages resulting from one. See *Carnation Co. v. Pacific Conference*, 383 U.S. 213, 224, 86 S.Ct. 781, 787, 15 L.Ed.2d 709 (1966).

Defendants additionally point to 49 U.S.C. § 15a(3) and argue that its language is "inconsistent" with applying the antitrust laws to rail carriers. Defendants cite the portion of section 15a(3) which states:

> Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy. . . .

---

**5.** 49 U.S.C. § 5b(7) reads in full:

(7) The Commission is authorized, upon complaint or upon its own initiative without complaint, to investigate and determine whether any agreement previously approved by it under this section, or terms and conditions upon which such approval was granted, is not or are not in conformity with the standard set forth in paragraph (2) of this section, or whether any such terms and conditions are not necessary for purposes of conformity with such standard, and, after such investigation, the Commission shall by order terminate or modify its approval of such agreement if it finds such action necessary to insure conformity with such standard, and shall modify the terms and conditions upon which such approval was granted to the extent it finds necessary to insure conformity with such standard or to the extent to which it finds such terms and conditions not necessary to insure such conformity. The effective date of any order terminating or modifying approval, or modifying terms and conditions, shall be postponed for such period as the Commission determines to be reasonably necessary to avoid undue hardship.

Paragraph 2 is set forth at p. 865, *supra*.

**6.** Indeed, in *Iron Ore Rate Cases*, 44 I.C.C. 368, 376 (1917), the ICC discussed the issue of dock rates for iron ore at Lake Erie ports and observed:

> It is of course in the interest of the carriers that the ore should move over their own docks, since the cost per ton for overhead expenses tends to decrease as the tonnage handled over the docks increases; *but the right of the shippers or others to operate docks of their own can not be denied,* and if they can perform the service at a less cost per ton than the carriers charge, of it they elect to assess a lower charge for the service than the maximum allowed to the carriers, these are matters with which, as the situation is now understood, we are not concerned . . . Any service performed by the private docks in the way of loading, handling or storing the ore prior to the time of shipment is a matter to be disposed of between the dock and the shipper of ore. [Emphasis added.]

Section 15a(3) only ensures that the ICC will not disallow a reduced rail rate merely because it could potentially divert traffic away from competing modes of transportation such as trucks or airplanes. See *ICC v. New York, New Haven & Hartford Railroad*, 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963). Section 15a(3) cannot in any way be read as stating that the ICC's approval of a 5a agreement shields a subsequent conspiracy to eliminate a direct competitor from the antitrust laws.

The court therefore concludes that neither the actual language of 49 U.S.C. § 5b(9) nor the structure of section 5a as a whole can be read as shielding the conspiracy alleged by plaintiff from the antitrust laws.

### C.

Defendants argue that the legislative history of the Reed-Bulwinkle Act illustrates "that Congress did not contemplate a predatory intent exception to section 5a because plenary and exclusive regulation of collective ratemaking, including control of any predatory conspiracies, was vested with the ICC."

By way of background, joint railroad bureaus, associations, committees and conferences existed in large numbers before the passage of section 5b, the Reed-Bulwinkle Amendment. See H.R.Rep. No. 1100, 80th Cong., 2nd Sess., reprinted in 1948 U.S. Code Cong. & Ad.News, 1844–1845. Cooperative action among the railroads was recognized by Congress as critical for integrating the country's railroad into a single efficient shipping network. For instance, "carriers could not be expected to adjust their rates intelligently so as to fulfill the requirements of the [Interstate Commerce Act] unless they were permitted to organize...." *Id.* at 1849. As the House Report states:

> The carriers cannot effectively meet the requirements of the law, or provide the type of transportation that the public has come to expect and demand of them, if each is to be compelled to go it alone without a reasonable degree of consulta-

tion and agreement with other carriers....

*Id.* at 1851. The Reed-Bulwinkle Amendment was seen as necessary to ensure that the railroads could engage in cooperative ratemaking without fear that their activities might be subject to prosecution under the antitrust laws. To reach a proper accomodation between the antitrust laws and the national transportation policy, Congress provided that

> rate conferences, when approved by the ICC, and whose rate decisions are under final control of the ICC, shall not be subject to the antitrust laws with respect to the making and carrying out of such agreement in conformity with the Commission's requirements.

Remarks of Representative Bulwinkle, 94 Cong.Rec.Append. 4032 (1948).

Defendants contend that the congressional debates "leave no doubt that I.C.C. approval of a 5a agreement was intended to confer absolute antitrust immunity." Defendants point to colloquies such as the following to support their argument:

> MR. WHITE: Is it not true that for many years the Congress has over and over again directed that the procedure should be through the regulatory body and by means of the regulatory process, rather than through indictment in the courts for violation of the antitrust statutes?
>
> MR. REED: Yes; the whole procedure has been through the strengthening of regulations, rather than to use the severe and sometimes arbitrary methods of proceeding under the antitrust act.

43 Cong.Rec. 6594 (June 9, 1947).

Although such colloquies lend support to defendants' position, the legislative history must be read in its full context. At no point in time did either Senatory Reed or Representative Bulwinkle say that the bill would blanket the railroads with absolute antitrust immunity. Indeed, their consistent remarks suggest the opposite. Throughout the Senate hearings, opponents of the amendment, including Senator Russell of Georgia and others, argued that

its passage would completely immunize the railroads from the reach of the antitrust laws. Senator Reed steadfastly rejected this position. The following exchanges are illustrative:

> [Referring to a report of the Senate Small Business Committee, co-authorized by one of its employees, Mr. Childe]
>
> Mr. SPARKMAN. I know Mr. Childe, and have a very high regard for him. I am particularly interested in seeing his testimony in the volume before us. I should like to read a little further from the testimony, where he says this:
>
> However, I do not believe there is any necessity or reason for relieving carriers from liability under the antitrust laws.
>
> That is Mr. Childe's testimony, and if I understand correctly, the pending bill does that very thing.
>
> Mr. RUSSELL. That is the purpose of it.
>
> Mr. SPARKMAN. That is Mr. Childe's testimony.
>
> Mr. REED. Mr. President, will the Senator from Georgia yield? I should like to submit a little more of the testimony.
>
> Mr. RUSSELL. I want to get along; but I yield.

Continuing with Mr. Childe's testimony, Senator Reed read:

> I believe that the rate committees and other conferences of the carriers should be regulated by the Interstate Commerce Commission to make them more effective in the public interest and to guard against abuses, and that the antitrust laws should remain in full force and effect, as a protection against any combinations or conspiracies for unlawful purposes.

The CHAIRMAN. Let me ask you there—in one breath you say they should be under the supervision or regulatory power of the Interstate Commerce Commission; and in the next you say they should be subject to prosecution under the Sherman antitrust law. Of course, these two things are inconsistent for the simple reason that if you say they can make an agreement, regulated by the Interstate Commerce Commission, the Government could not prosecute them under the Sherman antitrust law unless coercion could be shown.

> Mr. CHILDE. That is true. I think prosecution under the antitrust law should be against collusive practices for unlawful purposes.

Senator Reed then added: "With that I agree." 93 Cong.Rec. 6613–14 (1947).

Senator Reed later continued:

> Mr. President, the merits of this bill require consideration by the Congress, regardless of the pending antitrust litigation against the railroads.
>
> This bill is prospective in its operation and does not have the effect of giving the railroads immunity for anything illegal that they may have done in the past.
>
> Georgia's suit in the Supreme Court against the railroads is a suit that charges the railroads with having combined and conspired to fix rates, by coercion, that discriminate against Georgia.

He then emphasized:

> This bill does not give any immunity to any coercive combination. Paragraph 6 leaves such a combination subject to the antitrust laws, just as it is today.[7]

93 Cong.Rec. 7204 (1947).

A somewhat similar colloquy occurred during the course of an argument over

---

7. At the time of the statement, paragraph 6 of S.110, the Senate Bill, contained the following language inserted at the behest of Senator Russell:

> Nothing in this section and no approval of any agreement by the Commission under this section shall be so construed as in any manner to remove from the purview of the antitrust laws any restraint upon the right of

independent action by means of boycott, duress, or intimidation.

This language was removed by the House Conference Committee before passage of the final bill. The legislative history is barren of specific reasons as to why this language was removed. Hence, no legislative intent may be inferred from the removal of Senator Russell's amendment to the Senate bill. But it appears from the following exchange with Senator O'Mahoney

whether the case of *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) (see p. 864, *supra*) would be mooted by passage of the amendment:

Mr. McFARLAND. The Department of Justice informed the Senator from Arizona that so far as the rate part of that case is concerned it will do away with it. Where does the Senator get his information? Is it the result of his own analysis, or is it from the attorneys for the defendants in those cases?

Mr. REED. Mr. President, the case of the State of Georgia rests upon the allegation of a conspiracy between the railroads to establish rates which were illegal because discriminatory. The bill has no relation at all to any case that rests upon conspiracy. The bill, if enacted into law as I firmly believe it will be today, will not affect the Georgia case or the Lincoln case in the slightest degree.

Additional portions of the legislative history further reveal that the authors of the amendment never intended it to put conspiracies to drive competitors out of business beyond the reach of the antitrust laws.[8] For example, after the final bill was

(Montana) that Senator Reed felt that the Russell amendment was not needed:

Mr. O'MAHONEY. Just another quotation, with the Senator's indulgence. This was an amendment which was inserted by the Senate in order to make sure that no conspiracies would be permitted under the Bulwinkle-Reed bill. I read from paragraph (6):

Nothing in this section and no approval of any agreement by the Commission under this section shall be so construed as in any manner to remove from the purview of the antitrust laws any restraint upon the right of independent action by any carrier by means of boycott, duress, or intimidation.

In other words, the Senate said there should be no approval of any device by which boycott, duress, or intimidation should be applied to any carrier. The conference eliminated that amendment. Is that the way to prevent conspiracy?

Mr. REED. When some useless language is inserted in a bill for political purposes, and accepted by the Senator in charge of the bill at the end of 5 days' debate in order to get the bill through the Senate, and the conferees on the part of the House say, "If you expect us to consider that kind of bunk seriously you are mistaken."

Mr. O'MAHONEY. Does the Senator say it is useless to prevent boycott, coercion, or intimidation, and can it be prohibited when exemption is being granted from the law which enforces it?

Mr. REED. Of course we are not granting any exemption. The constant misstatements of the Senator from Wyoming—I wish he would make them in his own time—

Mr. O'MAHONEY. There is no limitation on debate.

Mr. REED. No; and certainly the Senator from Wyoming exercises his privilege very freely in that respect.

Mr. O'MAHONEY. Does the Senator object to being catechised on this subject?

Mr. REED. It would not do any good to object to the Senator from Wyoming utilizing his privilege as a Senator and taking a lot of time in debate.

Mr. O'MAHONEY. The Senator can substitute personalities for argument, and I have no objection to that, because I know the RECORD will show that personalities cannot outweigh the facts. The facts are that the Senate put in the bill a prohibition against boycott, intimidation, and coercion, and the conferees took it out.

Mr. REED. It is in the law, anyway.

Mr. O'MAHONEY. Where?

Mr. REED. I shall call attention to it later. I ask the Senator from Wyoming to permit me to complete my statement, and then make his speech and make his statements, including his misstatements, in his own time.

Mr. O'MAHONEY. Will the Senator be good enough to point out my misstatements?

Mr. REED. I do not yield.

94 Cong.Rec. 8417 (1948).

8. The court accords greater weight to the statements of the bill's authors as to the scope and breadth of the bill than to the assertions of the bill's opponents that its adoption would permit the railroads to engage in "boycott[s], coercion, or intimidation." The opponents' warnings do not override the intent of the bill's framers. As the Supreme Court stated in *Schwegmann Bros. v. Calvert Corp.*, 341 U.S. 384, 394–95, 71 S.Ct. 745, 750–51, 95 L.Ed. 1035 (1951):

The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt.

Similarly, in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 204, n. 24, 96 S.Ct. 1375, 1386, n. 24, 47 L.Ed.2d 668 (1976), the court observed:

Remarks of this kind made in the course of legislative debate or hearings other than by persons responsible for the preparation or the drafting of a bill are entitled to little weight. See, *e.g.*, *United States v. United Mine Workers*, 330 U.S. 258, 276–277, 67 S.Ct. 677, 687–

passed in both Houses over the veto of President Truman, Representative Bulwinkle addressed the House with the "desire to state what the law will do and what it will not do." 94 Cong.Rec.Append. 4032 (1948). Firmly stating that the amendment would not moot the charge in *Georgia v. Pennsylvania R. Co., supra,* that certain railroads had violated the antitrust laws, Representative Bulwinkle stated:

The charge made against the railroads in the Georgia case is that they combined and conspired to fix rates by coercion and to discriminate against Georgia. *A combination or conspiracy of that kind would not be protected or immunized by S. 110.* [Emphasis added.] [9]

Moreover, the final House and Senate Reports observed:

The bill leaves the antitrust laws to apply with full force and effect to carriers, so far as they are now applicable, except as to such agreements or arrangements between them as may have been submitted to the Interstate Commerce Commission and approved by that body upon a finding that, by reason of furtherance of the national transportation policy as declared in the Interstate Commerce Act, relief from the antitrust laws should be granted.

H.R.Rep. No. 1100, 80th Cong., 2nd Sess., reprinted in 1948 U.S.Code Cong. & Ad. News, 1848.

These excerpts from the legislative history contradict defendants' contention that the Reed-Bulwinkle Amendment was enacted with the intent of conferring absolute antitrust immunity upon railroads who are signatories to a 5a agreement. The legislative history, read as a whole, strongly suggests that the Reed-Bulwinkle Amendment's authors never envisioned its grant of antitrust immunity as being absolute. As a result, this court is unable to embrace defendants' assertion that the legislative history "leaves no doubt" that approval of a section 5a agreement by the ICC necessarily confers antitrust immunity upon sig-

---

88, 91 L.Ed. 884 (1947); *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 125, 62 S.Ct. 523, 529, 86 L.Ed. 726 (1942). This is especially so with regard to the statements of legislative opponents who "[i]n their zeal to defeat a bill ... understandably tend to overstate its reach." *NLRB v. Fruit Packers,* 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964). See *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394–395, 71 S.Ct. 745, 750–51, 95 L.Ed. 1035 (1951).

9. Representative Bulwinkle continued:

The conspiracy charged by the State of Georgia is a conspiracy to fix rates by coercion and to discriminate against the State of Georgia in the rates so fixed. This is the way the Supreme Court construed Georgia's pleading; it was this kind of a cause of action that the Supreme Court permitted the State to bring....

The Supreme Court in its opinion granting the State of Georgia leave to file its amended bill of complaint held that a certificate issued under a statutory provision similar to S. 110 did not prevent the Court from granting the State of Georgia equitable relief if the State could prove its charges. This holding was made with respect to the effect of certificate 44 which had been issued under section 12 of the act of June 11, 1942. The provisions of that act were analogous to the provisions of S. 110. The act authorized the Chairman of the War Production Board to issue certificates which provided that the antitrust law should not apply to certain kinds of activity which were found by the Chairman of the War Production Board to be requisite to the prosecution of the war. Such a certificate had been issued by the Chairman of the War Production Board with respect to the rate conferences and committees involved in the Georgia case. The Supreme Court held that this certificate did not prevent the State of Georgia from bringing suit in the Supreme Court. Speaking of certificate 44 the Court said: It does not sanction the use of coercion. It does not authorize any combination to discriminate against a region in the establishment of rates. (*Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 459, 65 S.Ct. 716, 727, 89 L.Ed. 1051), footnote 7.)

This holding of the Supreme Court is a decisive answer to the suggestion that if S. 110 becomes law the Georgia case will be moot and the Supreme Court will be prevented from granting relief to the State of Georgia.

It follows that if the State of Georgia can prove that, in fact, the railroads have combined and conspired to fix rates by coercion and to discriminate against the State of Georgia, nothing in S. 110 will prevent the Supreme Court from issuing an injunction that prohibits the railroads from engaging in that kind of activity.

94 Cong.Rec.Append. 4033–34 (1948).

natories who conspire to eliminate a competitor.

D.

The court now turns to the relevant case law cited by each side to support their respective positions. In support of its argument against defendants' motions, plaintiff cites several cases. Plaintiff's lead case is *Atchison, Topeka & Santa Fe Railway v. Aircoach Transportation Association,* 253 F.2d 877 (D.C.Cir.1958), *cert. denied,* 361 U.S. 930, 80 S.Ct. 372, 4 L.Ed.2d 354 (1960).

In *Aircoach,* four supplemental air carriers and the transportation association to which they belonged sued forty railroads and two rate committees for treble antitrust damages and an injunction. Plaintiffs alleged that two specific practices of the railroads in connection with their charges for United States military traffic violated sections 1 and 2 of the Sherman Act. The practices included the railroads' concerted quotations of "variable spot bids" for military traffic at rates below their published schedules, and the making of "package bids" in which the railroads agreed to carry military personnel only on an "all or nothing" or "package" basis.

The defendants argued that their rate quotations "were made pursuant to section 22 of the Interstate Commerce Act and [were] immunized from the operation of the antitrust laws by an agreement approved by the Interstate Commerce Commission pursuant to section 5a of that Act." *Id.* at 880. The district court ruled that section 22 rate quotations were excluded from section 5a agreements and, therefore, left unprotected from the antitrust laws. The D.C. Circuit reversed the ruling and held that section 22 rate activities, like other commercial railroad rate activities, were in certain circumstances entitled to express antitrust immunity protection under 49 U.S.C. § 5b(9). The court remanded the case to the district court with instructions to initially submit the case to the ICC to determine whether the activities at issue were carried out pursuant to the railroads' section 5a agreements.

In instructing the district court to initially submit the case to the ICC, the circuit court attached a critical condition to its order. The court stated:

One further substantive legal question must be considered. Even though it should be found in the end that the practices as such have been validly immunized by section 5a approved agreements, nevertheless, if they are part of an effort by Railroads in combination or conspiracy to eliminate the competition of Aircoach, rather than used merely to meet that competition, the practices would be removed from the protection of section 5a(9). We do not think the Act or any agreement which has been approved under it can be construed as authorizing the use of such practices for the purpose of eliminating the competition of Aircoach for the section 22 transportation involved.

*Id.* at 887. The court further stated that "this aspect of the case need not be submitted for consideration or initial decision by the Commission as to either questions of fact or law." *Id.* If Aircoach prevailed on this aspect of the case, defendants "would be liable in damages, and an appropriate injunction also could be granted." *Id.*

*Aircoach* was immediately followed by *Riss & Company v. Association of American Railroads,* 170 F.Supp. 354 (D.D.C. 1959), *cert. denied,* 361 U.S. 804, 80 S.Ct. 108, 4 L.Ed.2d 57 (1959). *Riss* involved a suit by a trucking company against first class railroads for allegedly conspiring to destroy the trucking company's business and to acquire a monopoly of land transportation of property in the United States. The railroads argued that the case involved ratemaking over which the ICC had primary jurisdiction. Defendants argued that their rates had been approved by the ICC, and were immune from the antitrust laws under 49 U.S.C. § 5(b)(9).

The *Riss* court pursued the path laid down in *Aircoach:*

It is clear from the ... language in the ACTA case that a court need not refer to the Commission the issue of whether a rate quotation was made as a part of a combination or conspiracy to eliminate a competitor. This follows logically because such a joint act if combined with the unlawful intent of eliminating a competitor would fall outside of the immunity granted by 49 U.S.C. § 5b(9) regardless of a possible I.C.C. ruling that the methods of arriving at the new rate conformed to prior procedural agreements filed with and sanctioned by the Commission.

170 F.Supp. at 362. Summarizing, the court stated:

... if it should develop at trial that the plaintiff can prove that the rate reduction ... was one of several overt acts alleged, and prove that this rate reduction was made for the purpose of effectuating one of the principal objects of the conspiracy charged therein; that is, the elimination of plaintiff as a competitor with the railroads for explosives traffic, then under ACTA no amount of coverage by approved agreements and no degree of immunity under 49 U.S.C.A. § 5b(9) could remove the rate reduction from the prohibitions of the Sherman Act ... it would seem that the antitrust immunity that defendants invoke was designed to protect ordinary rate-making in the course of regular business so as to adjust to changing costs and to meet the challenges of outside competition ... Even if a given joint act of reducing rates were to be considered as lawful standing by itself, it may still be properly alleged as one of the means used to effectuate a conspiracy to accomplish an unlawful object.

*Id.* at 366.

Thus, *Aircoach* and *Riss* do not attack regulated rates in and of themselves; they assail predatory conspiracies to eliminate competition within regulated industries. Nevertheless, defendants launch a direct assault on *Aircoach.* They argue that the D.C. Circuit cited no direct authority for its "remarkable revision of the clear language of the [Interstate Commerce] Act." As seen, however, the actual language of the Reed-Bulwinkle Amendment cannot be read as shielding conspiracies to eliminate competitors from the antitrust laws. Moreover, the citation of authority in *Aircoach* confirms that the decision stands upon solid ground.

The court in *Aircoach* cited *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) as a leading authority for its proposition that neither the Interstate Commerce Act nor any agreement approved under it can be construed as shielding from the antitrust laws conspiratorial conduct undertaken to eliminate a competitor. 253 F.2d at 887. In *Georgia,* the Supreme Court grappled with defendants' contention that a discriminatory conspiracy carried out through the coercive fixing of rates was shielded from the antitrust laws by an immunity provision similar to 49 U.S.C. § 5(b)(9). In a footnote, the Court observed:

We have considered the argument that Certificate No. 44, issued March 20, 1943 under § 12 of the Act of June 11, 1942 (56 Stat. 357) by the Chairman of the War Production board (8 Fed.Reg. 3804) protects this alleged combination from the charges contained in the bill. That certificate approves joint action by common carriers through rate bureaus and the like in the initiation and establishment of rates. We do not stop to analyze it beyond observing that in no respect would it be a bar to the present action. It does not purport to be retroactive. It does not sanction the use of coercion. It does not authorize any combination to discriminate against a region in the establishment of rates. Moreover, legal means may be employed for an illegal end.

324 U.S. 459, n. 7, 65 S.Ct. at 727, n. 7. The *Aircoach* court's reliance on *Georgia* was correct because as previously shown, *Georgia* continued to represent binding precedent after the passage of the Reed-

**874**

Bulwinkle Amendment. See p. 871, *supra*.

The *Aircoach* court also relied on the persuasive legal analysis in *Slick Airways v. American Airlines*, 107 F.Supp. 199 (D.N.J.1952), *appeal dismissed sub nom., American Airlines, Inc. v. Forman*, 204 F.2d 230 (3rd Cir.), *cert. denied*, 346 U.S. 806, 74 S.Ct. 54, 98 L.Ed. 336 (1953). In *Slick*, plaintiff alleged that defendant American conspired with other airlines to drive it out of business in order to monopolize the business of air freight transportation. Plaintiff maintained that as part of a conspiratorial campaign, defendants engaged in a series of predatory rate activities. Similar to the Interstate Commerce Act, the Civil Aeronautics Act provides express antitrust immunity for air carriers carrying out any acts authorized, approved, or required under an agreement filed with the Civil Aeronautics Board. As in this case, defendants contended that the alleged combination and conspiracy was immunized by an agreement which had been approved by the CAB. But the court did not "concur with the suggestion that a conspiracy to drive a competitor out of business ... is the type of agreement encompassed within the statute and subject to the primary jurisdiction of the CAB for approval or disapproval and for possible immunity from the antitrust laws." *Id.* at 207. The court explained:

> The defendants misconceive the nature of the complaint by confusing the means allegedly used with the result to be achieved. They view the complaint as alleging combinations or conspiracies to waste the resources of the plaintiff through predatory rate policies, to abuse the privilege of intervention in CAB proceedings, and to conduct a campaign of unfair competitive practices which amount to contracts and agreements within the purview of § 492. It is in this

that they fall into error for these alleged acts rather constituted the means and methods by which the defendants conspired to drive the plaintiff out of business in violation of the anti-trust laws. As the Supreme Court said in *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575: "It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."

*Id.*

Several recent cases have applied an *Aircoach* type analysis in regulated industry antitrust suits. For example, *BBD Transportation Co. v. U.S. Steel Corp.*, 1976–2 Tr.C. (CCH) ¶ 61,079 (N.D.Col.1976), held that a plaintiff motor carrier's allegations that defendant steel companies and railroads conspired to reduce railroad rates in order to force the trucking industry to lower its rates could not be eliminated on a motion for summary judgment. The allegations, the court stated, "[i]f eventually proven to be true ... would strip away immunity otherwise conferred by 49 U.S.C. § 5b(9)." *Id.* at p. 69,873. Similarly, *United States v. Baltimore & Ohio R.R.*, 538 F.Supp. 200 (D.D.C.1982), the criminal analogue of the present case, adopted *Aircoach's* holding that "section 5a immunizes the collusive making of rates but does not immunize the collusive making of rates which are intended to eliminate competition." *Id.* at 207–08.[10]

The court now turns to defendants' contention that "the better reasoned cases

---

**10.** The *Aircoach* reasoning has been applied in the context of a variety of other regulated industries. For example, see *U.S. v. Braniff Airways, Inc.*, 453 F.Supp. 724 (W.D.Tex.1978) (conspiracy to eliminate an air competitor not immunized by the Federal Aviation Act's express immu-

nity provision), and *Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.*, 489 F.2d 203 (9th Cir. 1973), *cert. denied*, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974). Also see *United States v. American Telephone & Telegraph Co.*, 461

hold that lawsuits charging railroads with predatory ratemaking are precluded by § 5a." As their lead case, defendants cite *Asbury Graphite, Inc. of California v. Dehyco Co.*, 1981–1 Tr.C. (CCH) ¶ 63,980 (N.D.Cal.1980). In *Asbury*, the court confronted a claim by a processor of furfural residue that another processor had conspired with ten railroads to monopolize the market in the Pacific Northwest by means of a railroad tariff allegedly favoring the competitor. The court ruled that 49 U.S.C. § 10706, which now replaces section 5(b) (see n. 2, *supra*), "on its face" immunized the defendants from the antitrust laws:

> Even if the ratemaking were actually 'conspiratorial' and 'monopolistic,' as alleged, since it unquestionably took place within the context of amending an approved freight bureau rate, the antitrust laws are inapplicable.

*Id.* at p. 76,072.

The *Asbury* court based its decision upon its finding that the enactment of 49 U.S.C. § 5(b) resulted from an adverse congressional reaction to *Georgia v. Pennsylvania*

F.Supp. 1314, 1328–29 (D.D.C.1978), in which the court ruled:

> This complaint alleges a broad conspiracy to monopolize various aspects of the telecommunications industry through a symbiotic relationship among AT & T, Western Electric, Bell Labs, and the Bell Operating Companies (see p. 1350, *supra*). Even if it be assumed, *arguendo*, that the Commission exercised explicit regulatory authority over some segments of the activities challenged in the complaint, it does not follow that defendants are immune from antitrust liability even with respect to them. Defendants' purpose is alleged to be the monopolization of the telecommunications service and equipment market, and the bulk of their conduct, including that revolving around Western Electric and Bell Labs, cannot under any reasonable view be regarded as immune from antitrust enforcement by virtue of regulation. In that circumstance, the remainder of the challenged conduct is likewise subject to antitrust consideration, both because it constitutes a means for achieving an unlawful end *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972), and because it represents one facet of a larger monopolistic scheme. [Citations omitted.]

*Id.* at 1329–30.

*R. Co., supra.* As previously seen, this court does not read the legislative history or the words of 49 U.S.C. § 5(b)(9) as nullifying the impact of *Georgia v. Pennsylvania R. Co., supra.* Nor does this court find persuasive the *Asbury* court's citation of *McLean Trucking Co. v. United States*, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944). In *McLean*, a trucking company challenged under the antitrust laws an ICC approved merger of seven motor carrier companies. Since 49 U.S.C. § 5(11) expressly immunizes ICC approved mergers from the antitrust laws, the Court in *McLean* held that the Commission had the power to approve and thereby immunize a merger which might otherwise violate the antitrust laws. Consequently, the holding in *McLean* has little if any bearing on the issue of whether the ICC's approval of a section 5a railroad agreement completely shields from the antitrust laws signatory railroads that conspire to eliminate a competitor.[11] Therefore, this court finds the reasoning in *Asbury* to be unpersuasive.

Calling attention to antitrust cases raised in the context of other regulated industries,

11. As noted in the House Report accompanying the Reed-Bulwinkle Amendment with respect to 5a agreements:

> It is important to note ... that in the case of a rate association, or any similar joint organization, it is not the rates or other collective actions resulting from the association procedures that the bill contemplates will be submitted by the carriers to the Commission for approval. What is to be submitted in such case is the basic agreement setting up the association and defining the nature and scope of its activities and its mode of procedures.

H. Report at p. 1855. Unlike the plaintiff in *McLean*, plaintiff Pinney is not challenging the immunity of the ICC approved agreement. Rather, plaintiff alleges that the defendants acted outside of and contrary to the agreement by conspiring to eliminate it as a competitor and monopolize the industry.

For the reasons outlined, the court also finds *Interstate Investors, Inc. v. Transcontinental Bus Sys., Inc.*, 310 F.Supp. 1053 (S.D.N.Y.1970), cited by the defendants, to be inapplicable to the present case. See also *Hughes Tool Co. v. Trans World Airlines*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), and *Pan American World Airways v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963).

Two additional cases cited by defendants as supporting the *Asbury* decision are also inappo-

defendants argue that they are inconsistent with the holding in *Aircoach.* In *Dreisbach v. Murphy*, 658 F.2d 720 (9th Cir. 1981), plaintiff owner of a ship devanning facility in Los Angeles alleged that a rival devanner and three shipping companies conspired to boycott his company's services. Pursuant to a section 15 agreement,[12] the defendant carriers had agreed to exclusively use the devanning services of one of plaintiff Dreisbach's competitors.[13] The court held that the joint choice of an exclusive devanning company was the type of "routine operating practice" within the scope of the carriers' FMC approved section 15 agreement. *Id.* at 729. It was, therefore, outside the reach of the antitrust laws. Because the Ninth Circuit found it "unnecessary to determine whether there was a conspiracy," *id.* at 729, n. 9, defendants argue that *Dreisbach* is inconsistent with the *Aircoach* ruling that "a purpose

to destroy competition ... would have the legal result of removing [the] railroads from any possible protection from the antitrust laws." 253 F.2d at 887. However, the anticompetitive activities and conspiracy which Pinney alleges in this case involve far more than the established industry-wide practice which the *Dreisbach* court evaluated.[14]

As additional support for their position, defendants cite *U.S. v. Rock Royal Co-op.*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939). The issue in the case concerned "the validity of Order No. 27 of the Secretary of Agriculture, issued under the Agricultural Marketing Agreement Act of 1937, regulating the handling of milk in the New York metropolitan area." 307 U.S. at 541, 59 S.Ct. at 997. Certain milk dealers refused to comply with the provisions of the order. When the United States sought an order requiring them to comply, the dealers

---

site. In *Monticello Heights, Inc. v. Morgan Drive Away, Inc.*, 1974–2 Tr.Cas. (CCH) ¶ 75,282 (S.D. N.Y.1974), plaintiff's antitrust claims were dismissed on the grounds that they were barred by *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). The *Keogh* doctrine and its applicability to this case are discussed in section III, *infra.*

*Baltimore & O.R. Co. v. New York, N.H. & H.R. Co.*, 196 F.Supp. 724 (S.D.N.Y.1961), concerned a suit to recover per diem rental rates for the use by defendants of plaintiffs' freight cars. As a defense, defendants claimed that despite the existence of a binding contract, they were not bound to pay the contractual rate because plaintiffs had fixed the rates and forced defendants to pay them in violation of section 5A of the ICA and the Sherman Act. The court ruled that a finding by the Interstate Commerce Commission in a previous hearing that the plaintiffs had not engaged in the alleged activities precluded (under the doctrine of collateral estoppel) the defendants from relitigating the issue before the court.

Neither the *Monticello* court nor the *Baltimore & O.R. Co.* court ever addressed the immunity issue facing this court.

**12.** Section 15 of the Shipping Act, 46 U.S.C. § 814, permits water carriers to file with the Federal Maritime Commission (FMC) agreements relating to rates and other matters. When an agreement is approved by the FMC, it is immunized against the operation of the antitrust laws. But see *Carnation Co. v. Pacific Conference*, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), and *In re Ocean Shipping*

*Antitrust Litigation,* 500 F.Supp. 1235 (S.D.N.Y. 1980), for statements that section 15 antitrust immunity does not extend to the implementation of agreements unapproved by the FMC.

**13.** The court observed that "the plain language of the section 15 agreements on the present record encompasses carriers' agreement to use Murphy as their one devanner in Los Angeles, and that agreement is not directly contested by appellant Dreisbach...." *Id.* at 724.

**14.** The Ninth Circuit noted that plaintiff Dreisbach's allegations were not "supported by evidence." 658 F.2d at 729, n. 9, and at 730, n. 11. Moreover, the court stated:

There is no evidence, and no allegation, that the Carriers here are the only carriers requiring a devanning service in Los Angeles, or that Dreisbach was impeded in any manner from seeking to render devanning services in Los Angeles to other carriers.

658 F.2d at 729, n. 10. The *Dreisbach* court correctly observed that "[e]very agreement of carriers to use one supplier of a service can be said to confer monopoly status and antitrust immunity on that supplier, at least insofar as rendering the service to those carriers is concerned." In this case, plaintiff alleges that the railroads conspired to completely eliminate them as a direct *competitor* in the dock handling of iron ore. Rather than choosing among competing services, as in *Dreisbach,* defendants in this case are alleged to have conspired to eliminate a *competing* service, thereby foreclosing the choices of their customers.

argued that the order was invalid because its adoption was secured by misrepresentations and because certain private organizations had sought to obtain a monopoly by means of the order. The district court concluded that the order was not enforceable because coercive tactics were used to secure the drafting, acceptance and adoption of the order so as to obtain a monopoly.

Under the Agricultural Marketing Act, the Secretary was authorized to issue orders applying to milk to establish and ensure orderly conditions in its marketing. On appeal, the Supreme Court ruled that the initial adoption of the order met with the required statutory standards. After then noting that efforts to compel dealer support of the order by the threat of diverting milk sales were "ineffective upon these defendants," the Court stated:

> These associations of producers of milk have a vital interest in the establishment of an efficient marketing system. This adequately explains their interest in securing the adoption of an order believed by them to be favorable for this purpose. If ulterior motives of corporate aggrandizement stimulated their activities, their efforts were not thereby rendered unlawful. If the Act and Order are otherwise valid, the fact that their effect would be to give cooperatives a monopoly of the market would not violate the Sherman Act or justify the refusal of the injunction.

307 U.S. at 560, 59 S.Ct. at 1006.

Although the defendants correctly argue that the Court minimized the importance of the "influences which caused the producers to favor" the order issued by the regulatory agency, the issue in this case is not whether any order of the ICC is constitutional or enforceable. The issue is whether the defendants acted outside the scope of 49 U.S.C. § 5b(9)'s limited grant of antitrust immunity by conspiring to exclude plaintiff as a competitor.[15] Therefore, this court does not read *Rock Royal* as a mandate to hold that the activities alleged by plaintiff in this case are beyond the reach of the antitrust laws.

Defendant B & LE, in a supplemental letter, calls to the court's attention *National Association of Recycling Industries v. American Mail Line, Ltd.*, No. CV82–895–LTL (D.C.Cal. 12/3/82) (*NARI*). *NARI* involved an antitrust suit by a trade association for the paper recycling industry and three of its member firms against a number of ocean carriers and their rate conference. Plaintiffs alleged "that the rates charged by defendants for transporting plaintiffs' wastepaper to the Far East [were] so 'exceedingly high and unjustly discriminatory' that plaintiffs [could] not successfully compete against shippers of processed woodpulp and virgin wood chips, raw materials in direct competition with wastepaper." The court dismissed the complaint, holding that defendants' rate-making activities were immunized from the antitrust laws by the Shipping Act "regardless of whether those rates [were] later found to be violative of substantive provisions of the Shipping Act." This court

---

**15.** Citing *Eastern Railroad Presidents' Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), defendants argue that "the Supreme Court has more recently confirmed that conduct which is otherwise immune from the antitrust laws cannot give rise to antitrust liability simply because it was undertaken with predatory intent." However, this court agrees with the following language of Judge Parker in *United States v. Baltimore & O.R.R.*, 538 F.Supp. 200, 207 (D.D.C.1982):

> ... These cases [*Noerr* and *Pennington*] provide [defendants] no solace. At issue was the question whether the lobbying of the legislature and the executive (*Noerr*) or the attempt to influence public officials (*Pennington*) would be immunized from the antitrust laws by the First Amendment even when the actions were intended to eliminate competition. *Aircoach*, on the other hand, was concerned not with whether activity otherwise illegal under the Sherman Act is impliedly immunized by a constitutional provision but, rather, with whether such conduct is explicitly immunized by the Reed-Bulwinkle Act. In other words, the *Aircoach* Court was guided not by abstract constitutional principles but, rather, by the legislative history and statutory intent behind section 5a.

finds *NARI* to be "analytically distinguishable" from *Aircoach,* and not inconsistent with it.[16]

### E.

Having examined the actual language of the Interstate Commerce Act, the pertinent legislative history, and the relevant case law, the court concludes that it should apply an analysis similar to that employed in *Aircoach* and its progeny. Since a conspiracy to eliminate a competitor cannot fall within 49 U.S.C. § 5b(9)'s limited grant of express antitrust immunity, plaintiff is entitled to prove its allegations that the defendants conspired to eliminate it as a competitor in order to monopolize the business of providing dock services for the unloading of ex-lake iron ore.

### III.

As a separate ground for dismissal, defendants contend that "this case falls squarely within the *Keogh* doctrine, which bars plaintiff's claim for damages." The *Keogh* doctrine was developed in *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Plaintiff Keogh, a manufacturer of excelsior and flax tow, sued eight railroad companies under the antitrust laws arguing that the uniform rates they set by agreement were arbitrary and unreasonable. As a defense, the railroads contended that the rates at issue had been approved by the Interstate Commerce Commission. The Court held that "Keogh, a private shipper, [could not] recover damages under [the an-

titrust laws] because he lost the benefit of rates still lower which, but for the conspiracy, he would have enjoyed." *Id.* at 162, 43 S.Ct. at 49. The Court explained:

"The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff, cannot be varied or enlarged by either contract or tort of the carrier (citations omitted). This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated. If a shipper could recover under section 7 of the Anti-Trust Act for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors...."

*Id.* at 163, 43 S.Ct. at 49.

The Court reaffirmed *Keogh* in *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). See p. 864, *supra.* The Court held that "it [was] clear from the *Keogh* case alone that Georgia [could] not recover damages even if the conspiracy alleged were shown to exist." *Id.* at 453, 65 S.Ct. at 724. The Court reiterated that under *Keogh,* "a rate was not necessarily illegal because it was the result of a conspiracy in restraint of trade." *Id.*

---

**16.** Finding the case before it to be "analytically indistinguishable" from *Sabre Shipping Corp. v. American President Lines, Ltd.,* 285 F.Supp. 949 (S.D.N.Y.1968), *cert. denied,* 407 F.2d 173 (2nd Cir.), *cert. denied,* 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 239 (1969), the *NARI* court criticized the portion of the *Sabre* opinion which held that filed but unapproved rates established under the authority of an FMC-approved agreement are shielded from antitrust attack only if they meet the substantive requirements of the Shipping Act. Significantly, however, the *NARI* court never faced the one issue in *Sabre* which bears directly on this case.

In *Sabre,* an independent shipping line charged that defendant shipping lines and con-

ferences conspired to unreasonably restrain and monopolize the Hong Kong—United States and Japan—United States shipping trade. Plaintiff alleged that in furtherance of the conspiracy, defendants plotted to drive it out of business through a series of predatory rate cuts. The *Sabre* court held that "predatory rate cutting ... cannot be immunized by the Commission from the antitrust laws under Section 15." *Id.* at 957.

Since plaintiffs in *NARI* never alleged that defendants conspired to eliminate them as competitors (plaintiffs in *NARI* did not compete with the ocean lines), the case has little bearing on the issues confronting this court.

This court does not read either *Keogh* or *Georgia* as precluding plaintiff Pinney from recovering damages under the antitrust laws if it is able to prove the allegations in its first amended complaint. Plaintiff alleges that the defendants conspired to monopolize the business of providing dock services for iron ore and other goods moving over docks on the lower Great Lakes. In order to carry out the ends of the conspiracy, it is alleged that the railroads actively plotted to eliminate plaintiff as a competitor. To accomplish their alleged predatory ends, it is asserted that defendants committed various overt acts including refusing to grant shippers a competitive rate for the carriage of iron ore from Pinney Dock.

█ Unlike the plaintiff in *Keogh*, plaintiff Pinney does not bring its antitrust suit simply to recover an alleged discriminatory overcharge. Plaintiff seeks to recover damages for the loss of business it allegedly suffered as a direct competitor of defendants. Plaintiff alleges that defendants plotted and carried out a conspiracy to eliminate it as a direct competitor. Unlike in *Keogh*, plaintiff Pinney competed with defendant railroads for the same customers, and plaintiff could serve those customers only if it in turn was served by defendants. Thus, plaintiff asserts that discriminatory rail rates were merely "a symptom or an incident" of a conspiracy to eliminate it as a competitor. See *Terminal Warehouse v. Pennsylvania R. Co.*, 297 U.S. 500, 510, 56 S.Ct. 546, 549, 80 L.Ed. 827 (1936). As *Terminal Warehouse* points out, antitrust damages may be recovered against rail carriers when they result from "an enveloping conspiracy with its own illegal ends ... the damages being measured not merely by the consequences flowing from the preference, but by those flowing from the conspiracy in all its comprehen-

sive unity." 297 U.S. at 511, 516, 56 S.Ct. at 550, 552.

Defendants correctly point out that in *Georgia v. Pennsylvania R. Co., supra,* the state of Georgia sued not only in its *parens patriae* capacity, but in its "capacity as a proprietor to redress wrongs suffered by the State as the owner of a railroad ...", 324 U.S. at 439, 65 S.Ct. at 716; the Court nonetheless held that *Keogh* blocked its claims for monetary damages. However, the Supreme Court in its decision never treated the state as a direct competitor of the defendants. The Court based its holding on the statement in *Keogh* that a recovery by a shipper under the antitrust laws for a rate higher than that which otherwise would have prevailed would operate as a rebate to give the shipper a preference over his trade competitors. In the present case it cannot be said that plaintiff will unfairly benefit in its status as a competitor of the railroads if it is permitted to recover damages resulting from a conspiracy by those very same competitors to drive it out of business and monopolize the industry.

Approaching the issue from another angle, defendants argue that this case lies within *Keogh's* bounds because "Pinney's claimed injury derives solely from alleged unreasonably high or discriminatory rail rates and charges." As support, defendants submit the various ICC approved iron ore rail tariffs in effect during the period of the alleged conspiracy. For example, Freight Tariff 93–K of the Pennsylvania Railroad Company issued on July 29, 1961 sets "commodity" rates for the transportation of iron ore from railroad docks to various destinations.[17] Defendants argue that the following 93–K tariff section expressly limited iron ore "commodity rates" to iron ore that was transported from railroad owned docks:

**17.** The Transportation Logistics Dictionary contains the following definition for a "commodity rate:"

*COMMODITY RATE* A rate on a specific commodity, or article, moving between specific points, sometimes in a specific direction, and sometimes for a specific minimum quantity. The purpose of the commodity rate is generally to provide a lower rate to reflect lower costs resulting from large scale movement or otherwise. The commodity rate can be higher than a class rate, but it usually is not.

CHARGES FOR UNLOADING ORE FROM VESSELS..

On Iron Ore arriving by vessel at the ports of Ashtabula Harbor, Ohio, Buffalo, N.Y. and Cleveland, Ohio, and unloaded by means of the machinery and other facilities owned and furnished by the Pennsylvania Railroad Company, the charge against the vessel for taking the Ore from the hold of the vessel to the rail of the vessel will be 28 cents per ton of 2240 pounds.

Service will be performed only where said machinery and facilities are able to unload the vessel.

DOCK ORE RATES FROM ASHTABULA HARBOR, OHIO..

The rates published in this tariff, as applying on Dock Ore from The Pennsylvania Railroad Docks at Ashtabula Harbor, Ohio, will also apply on Dock Ore from the Dock of the New York Central Railroad Company (Western District) at Ashtabula Harbor, Ohio, BUT ONLY WHEN SUCH ORE IS DELIVERED TO THE PENNSYLVANIA RAILROAD COMPANY AT ASHTABULA, OHIO.

Similarly, supplement 3 to Freight Tariff 2152–K of the Chesapeake and Ohio Railway Company read:

| Item No. | Subject | RULES AND OTHER GOVERNING PROVISIONS |
|---|---|---|
| | | Special Rules and Regulations–Unlimited |
| 125–A | Charge for unloading Ore from Vessel | On ore arriving by vessel at the port of Toledo Dock, Ohio, and unloaded by means of the machinery and other facilities owned and furnished by The Chesapeake and Ohio Railway Company, the charge against the vessel for taking the ore from the hold of the vessel to the rail of the vessel will be twenty-eight (28) cents per ton of 2,240 pounds. |

Defendant Note.—This service will be performed only where said machinery and facilities are able to unload the vessel.

Defendants contend that these rates, by their express terms, did not apply to shipments of iron ore from Pinney Dock, so that iron ore shipments from Pinney were relegated to the higher "class rate" system in effect.[18] For example, defendant B & LE states that "[f]rom February 1958 until April 1978 Pinney enjoyed class rates on any iron ore shipments tendered."

Several exhibits submitted as part of defendants' motion to dismiss based on the statute of limitations show that class freight rates applied off Pinney Dock. For example, G.B. Weir, Pinney's traffic manager, observed in an August 24, 1970 file memorandum:

The freight rate from Pinney Dock to Youngstown Sheet & Tube is roughly $5.00.

The freight rate from public ports and certain private docks for iron ore pellets (a commodity rate) is $2.08.

Similarly, in a June 9, 1971 memorandum, R.T. Beeghly, president of the Standard Slag Company, noted:

Shipment of ore can now be made from other Ashtabula docks to the steel mills at a $2.60 rate, whereas the established rate from Pinney Dock is $5.25.

Additionally, in June 1975, J.A. Del Priore, Pinney Dock's director of sales, informed J. Hagen, vice president-operations and facilities planning, United States Railway Association:

Our present rate on iron ore is $15.90 per gross ton to Pittsburgh and $11.42 per gross ton to the Youngstown area versus $4.83 per gross ton to Pittsburgh and

---

**18.** The Transportation Logistics Dictionary contains the following definitions for "class rate" and "class tariff:"

CLASS RATE It is a rate resulting from a rating provided in a classification. While commodity rates are available only on limited commodities, a class rate can be found on practically any commodity. The rate in the class rate tariff is normally on class 100 commodities. To determine the class rate it is necessary to multiply the first class rate by a percentage figure applicable on its rating. In the uniform freight classification, the percentage of first class is automatically provided in the classification. That is, a class 87 would mean 87% of first class. Class rates were created to simplify the preceding process providing a specific rate on each commodity moved.

CLASS TARIFF. A Tariff containing only class rates.

$3.62 per gross ton to Youngstown for the other facilities.

Nevertheless, it is disingenuous for B & LE to suggest that Pinney "enjoyed" ICC prescribed iron ore rates because "class rates" applied to Pinney Dock.[19] As previously illustrated, railroad rates for ex-lake iron ore historically have been regarded as separate and distinct from the rates on all other commodities. In *Iron Ore Rate Cases*, 41 I.C.C. 181 (1916), the Commission carefully set maximum rates for ex-lake iron ore from Ashtabula Harbor, Ohio to various destinations. The Commission stated:

> The *maximum rates herein found reasonable* as set forth in the foregoing table include, as heretofore explained, only the rail-line service from the line-haul carriers' tracks at the lake ports, after the ore has been loaded into the cars, to the points at destination where the carriers' tracks connect with the private industry tracks that serve the furnace plants. They do not include the dock service and the service of placing carload shipments of ore at the point of unloading on private industry tracks at destination, for which services separate charges should be established. [Emphasis added.]

*Id.* at 219. Since the transportation of ex-lake iron ore has historically been treated under a distinct commodity rate scheme, defendants cannot realistically argue that under the ICC's approved rate schedules, ore shipments from Pinney Dock were automatically covered by published and ICC approved "class rate" tariffs.[20]

Moreover, defendants' argument that plaintiff's claims are barred by *Keogh* because the injury resulted from discriminatory rail rates misses the heart of plaintiff's claim. It is the alleged conspiracy itself, rather than the implements used to carry the conspiracy out, which makes this more than a "simple ICC rate case." As the Supreme Court observed in *Continental Co. v. Union Carbide*, 370 U.S. 690,

---

**19.** B & LE asserts that "this rate system was prescribed by the ICC in *Class Rate Investigation, 1939*, [281] I.C.C. 213 (1951)."

Neither the case cited by B & LE nor its earlier companion, *Class Rate Investigation, 1939*, 262 I.C.C. 447 (1945), provides any justification for defendants' assertions. The focus of these cases was an investigation by the ICC (on its own motion) into "the lawfulness of interstate class rates, all-rail, all-water, and rail-and-water, applicable in the United States generally, except in mountain-Pacific territory and between that territory and the remainder of the country." 262 I.C.C. at 454. Nothing in the Commission's wide-ranging findings supports defendants' statement that under ICC rules, they were justified in quoting "class rates" for iron ore shipments off of private docks at the same time that they were assessing approved "commodity iron-ore rates" for shipments off of their own docks. Indeed, if such were the case, private docks such as Pinney could never have hoped to compete with the railroads in the handling of ex-lake iron ore because the existing freight class rates were so much higher than the published commodity iron ore rates. Yet, as previously pointed out, *supra*, at 867, the ICC itself observed:

> It is of course in the interest of the carriers that the ore should move over their own docks, ... but the right of the shippers or others to operate docks of their own cannot be denied.

44 I.C.C. at 376.

**20.** S.S. McKinley of the B & O noted in a letter of March 4, 1958 to S.I. Thompson:

> You have no doubt received copy of proceedings of the joint meeting held at Pittsburgh, Pa. February 26, distributed by Chairman Kern March 3.
>
> As additional information, after much discussion the attorneys agreed that we could not very well defend publication of higher specific line haul rates from the so-called public docks (Pinney at Ashtabula and Cleveland Stevedore at Cleveland) than are presently published from railroad and steel company private docks. You will recall higher rates previously had been suggested as a means of discouraging the handling of ore over public docks.
>
> Therefore, it was decided to docket a proposal with the Coal, Coke & Iron Ore Committee, C.T.R., on behalf of all lines publishing rates from railroads docks, to restrict the application of the line haul rates so they will only apply on ore received over the railroads' own docks (see CTR Submittal 10448, as amended).

Along the same lines in a Penn Central interoffice memorandum of November 21, 1968 to F.R. Weis, R.L. Wilson concluded that under *Iron Ore Rate Cases, supra*, Penn Central "would have to publish 'line haul' rates from Ashtabula Harbor, Ohio [for Pinney Dock]."

707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962):

> [I]t is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme.

A conspiracy to eliminate a competitor and monopolize an industry falls outside the bounds of day-to-day railroad ratemaking. For this reason, such a conspiracy is subject to the harsh consequences of the antitrust laws. Therefore, plaintiff is entitled to prove its allegations that defendants used the iron ore rate system to further a conspiracy to eliminate the direct competition of plaintiff in providing dock services for ex-lake iron ore. Should plaintiff prove its allegations, it will not be barred by *Keogh v. Chicago & Northwestern Railway Co., supra,* from recovering damages.

### IV.

Defendant B & LE separately argues that "certain of plaintiff's claims should be dismissed for lack of standing to assert them or because [the anticompetitive acts alleged] could not as a matter of law have caused direct or cognizable injury to plaintiffs."

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides a treble-damages remedy to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." As the Court recently observed in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 471, 102 S.Ct. 2540, 2545, 73 L.Ed.2d 149, 156 (1982):

> ... the lack of restrictive language reflects Congress' "expansive remedial

purpose" in enacting § 4: Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations. [Citations omitted] "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." [Citations omitted.]

■ Although section 4 of the Clayton Act's language is broad, the Court in *Associated General Contractors v. Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983), emphasized that questions of antitrust standing "cannot be answered simply by reference to the broad language of § 4. Instead, ... the question require[s] the [court] to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." The Court in *Associated* set forth several factors to be analyzed by district courts in deciding antitrust standing questions.[21] In addition to the threshold requirement that "the claim be encompassed by the Clayton Act," these include (1) "the nature of plaintiff's alleged injury;" (2) "the directness or indirectness of the asserted injury;" (3) whether the damage claims are "highly speculative;" and (4) the need to keep "the scope of complex antitrust trials within judicially manageable limits." *Id.* at 911.

■ Plaintiff's claims meet the Court's threshold requirement of being "encompassed by the Clayton Act." [22] The thrust

---

**21.** Under *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1235 (6th Cir.1981), to establish standing in an antitrust action, the sixth circuit requires:

"(1) that the plaintiff allege injury in fact and (2) that the interest which the plaintiff seeks to protect is arguably within the zone of interests protected by the statute in question."

In *Associated, supra,* the Court noted the sixth circuit's standing test, as well as the tests of several other circuits. The Court then observed that "these labels may lead to contradictory and inconsistent results." The Court stated "In our view, courts should analyze each situation in

light of the factors set forth in the text, *infra.*" At 907, n. 33.

**22.** In paragraph 1 of its complaint, plaintiff seeks redress for injuries to its business and property caused by defendants' alleged violations of section 3 of the Clayton Act, 15 U.S.C. § 14. In pertinent part, that section reads:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities ... or fix a price charged therefor, ... where the ef-

of plaintiff's complaint is that it was injured in its business and property by a conspiracy among the defendants to monopolize the business of providing dock services for iron ore and other goods moving over docks on the lower Great Lakes. Plaintiff contends that the alleged conspiracy was carried out through a series of anticompetitive activities: monopolizing ownership of docks on the lower Great Lakes used for the handling of iron ore; boycotting private docks; effectively tying the use of railroad-owned docks to the use of railroad lines; fixing and maintaining dock and railroad rates and charges; dividing markets; and raising spurious challenges to the legitimate business activities of competitors. Plaintiff's allegations meet section 4 of the Clayton Act's requirement that a plaintiff allege injury to its "business or property by reason of [something] forbidden in the antitrust laws."

Since plaintiff meets the threshold test, the court takes up the additional factors deemed pertinent to antitrust standing in *Associated*. Focusing first on the nature of plaintiff's alleged injury, the court notes that plaintiff is a direct competitor of defendants. As the Court stated in *United States v. Topco Associates, Inc.*, 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972):

> Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise ... And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster.

Since Pinney Dock could not effectively compete with defendants unless it had access to railroad lines, a railroad conspiracy to boycott it could effectively stifle its ability to compete in the business of providing dock services for the Great Lakes iron ore trade. Thus, the injury alleged by plaintiff is the type for which the Sherman Act seeks to provide a remedy.

An additional factor under *Associated* "is the directness or indirectness of the asserted injury." *Id.* at 909. In this case, the chain of causation between plaintiff's alleged injury and defendants' alleged antitrust violations is directly linked. According to the complaint, defendants sought to eliminate plaintiff as a competitor by boycotting it and charging it higher rates. Plaintiff was the direct target of defendants' alleged antitrust violations; defendants' alleged antitrust activities had as their ostensible purpose directly injuring plaintiff's ability to compete in the unloading of ex-lake iron ore.

In *Associated*, the Court expressed concern with allowing a party to proceed where its damage claims are "highly speculative." The Court noted its earlier ruling in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 475, 102 S.Ct. 2540, 2546–47, n. 11, 73 L.Ed.2d 149, 158, n. 11 (1982) that:

> Section 4 plainly focuses on tangible economic injury. It may therefore be appropriate to consider whether a claim rests at bottom on some abstract conception or speculative measure of harm.

In this case, the nature of the alleged economic injury suffered by plaintiff is the amount of business it lost as a result of defendants' alleged efforts to drive it out of the iron ore business.[23] Although determining a precise dollar figure for the alleged injury could prove to be an arduous task, "difficulty of ascertainment [should not be] confused with a right of recovery." *Bigelow v. RKO Radio Pictures*, 327 U.S.

---

fect.... may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

On its face, 15 U.S.C. § 14 applies only to "commodities." Since plaintiff's suit deals with dock and railroad "services," the interests plaintiff seeks to protect are not encompassed by 15 U.S.C. § 14. Therefore, plaintiff does not have standing to raise 15 U.S.C. § 14 in this case.

See *Capital Temporaries of Hartford, Inc. v. Olsten Corp.*, 383 F.Supp. 902, 904, n. 8 (D.Conn. 1974).

**23.** Defendant B & LE also moves for the dismissal of plaintiff's claims relating to coal and coke. The court reserves ruling on the issue in view of earlier discovery rulings, see transcript of December 4, 1980 hearing in this case.

251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). Thus, plaintiff's damage claims are sufficiently tangible and non-speculative to meet the Court's concern that antitrust damage allegations not be "highly speculative."

A fourth factor for consideration set forth in *Associated* is

the strong interest, identified in ... prior cases, in keeping the scope of complex antitrust trials within judicially manageable limits. These cases have stressed the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*Associated, supra,* at 911–12. Since plaintiff was a direct competitor of defendants in providing dock services for ex-lake iron ore, plaintiff's claim that it was injured by a railroad boycott and conspiracy to eliminate it as a competitor does not create the "risk of duplicate recoveries ... or the danger of complex apportionment of damages...." To the extent that plaintiff can prove that its ability to compete with defendants was damaged by the alleged conspiracy, its injury will have been sufficiently discrete and individualized to permit it to recover antitrust damages. Thus, plaintiff's complaint satisfies the Court's requirement that "the scope of complex antitrust trials [be kept] within judicially manageable limits."

As seen, plaintiff's complaint satisfies each of the factors deemed pertinent to antitrust standing by the Court in *Associated.* Therefore, plaintiff has standing to seek treble damages pursuant to section 4 of the Clayton Act.

■ Defendant B & LE takes its standing argument a step further and argues that even if plaintiff has standing to raise claims relating to an alleged boycott of its dock, it does not have standing to seek damages based on its allegations that defendants conspired to restrain "the business of providing water carriage for iron ore ... moving over docks on the lower Great Lakes, and ... the business of building ships for such carriage." Defendant B & LE further contends that plaintiff cannot show "cognizable injury in fact as a result of the alleged agreement to assess the same dock handling charges for bulkers and self-unloaders." [24]

■ Defendant B & LE errs in seeking to have this court treat the alleged anticompetitive activities as a series of separate and unrelated events. Plaintiff claims that it was injured by a multi-pronged conspiracy partially aimed at eliminating the competition of private docks in the handling of iron ore. As the Supreme Court stated in *Continental Co. v. Union Carbide,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962):

In [conspiracy] cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *United States v. Patten,* 226 U.S. 525, 544, 33 S.Ct. 141, 145, 57 L.Ed. 333....

The alleged conspiracy to maintain dock handling charges in order to discourage the development and use of self-unloaders relates directly to plaintiff's claim that defendants sought to eliminate its competition in the dock handling of ex-lake iron ore. Thus, plaintiff must be afforded the

---

**24.** In a supplemental letter to this court, defendant B & LE reiterates its argument that "plaintiff lacks standing to complain of defendants' iron ore dock handling charges...." Defendant B & LE argues that under *Associated General Contractors v. Carpenters, supra,* plaintiff could not have been directly injured by the alleged conspiracy to fix dock handling charges. Defendant B & LE states:

Steel company shippers are the parties which incur—and are directly affected by—iron ore dock handling charges ... Indeed, the alleged maintenance of handling charges ... would necessarily aid Pinney as competitor of defendants.

opportunity to prove its theory that defendants sought to buttress their alleged conspiratorial scheme to thwart the development and use of iron ore self-unloaders on the Great Lakes by seeking to eliminate private dock competition.

■ Defendant B & LE additionally asserts that Pinney Dock lacks standing to pursue its paragraph 12 allegation that defendants conspired to eliminate competition in and monopolize "the business of providing land transportation for iron ore and other goods moving over [docks on the lower Great Lakes]." The court agrees that plaintiff is not a proper party to raise such allegations. The alleged conspiracy to monopolize the land transportation of iron ore presents legal and factual issues wholly distinct from those generated by the alleged conspiracy to monopolize dock services. But as previously stated, plaintiff is entitled to prove that a group boycott of its dock effectively precluded it from competing with defendants. In so doing, plaintiff may offer evidence showing that alternate methods of iron ore transportation from Pinney Dock were either infeasible or unacceptable to Pinney's potential customers. Moreover, plaintiff may also attempt to prove its allegation that defendants conspiratorially harassed it in its attempts to truck iron ore from its dock, subject to the limitations imposed by *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Additional questions relating to the scope of evidence plaintiff may offer in support of its case can be more appropriately handled at pretrial or trial.

## V.

Since the court has ruled against defendants' motion to dismiss on each of the grounds raised, the court must address defendants' argument that this "case should be referred to the Interstate Commerce Commission in deference to that agency's primary jurisdiction." Defendants argue that the ICC should be afforded an opportunity to reach determinations as to the scope of the railroads' express immunity under section 5a and the validity of plaintiff's rate claims.

■ The doctrine of primary jurisdiction, as presented by the Supreme Court in *United States v. Western Pacific R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1959),

> applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

The Court described the test to be applied in deciding whether the doctrine should be invoked:

> No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.

*Id.* The court then emphasized the purpose and importance of the doctrine:

> Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Id.* at 65, 77 S.Ct. at 165, quoting *Far East Conference v. United States*, 342 U.S. 570, at 574–575, 72 S.Ct. 492, at 494, 96 L.Ed. 376 (1952).

Applying the Court's language, the relevant question in this case is whether considerations of uniformity in regulation and technical expertise mandate that the ICC be given an opportunity to pass on the

questions before this court. *See also Nader v. Allegheny Airlines,* 426 U.S. 290, 304, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976).

Taking up first the question of uniformity and consistency in the regulation of the railroad industry, this court repeats its earlier conclusion that defendants are subject to the antitrust laws unless they acted within the narrow protective scope of the section 5a Eastern Railroads Agreement. Since the alleged conspiracy to eliminate plaintiff as a competitor in order to monopolize the business of providing ex-lake iron ore dock services is not and can not be immunized by the ICC approved Eastern Railroad Agreement, any determination by the ICC as to the scope of defendants' antitrust immunity under their section 5a agreement is unnecessary.[25]

Nor does this court find that the ICC's technical expertise in the area of railroad ratemaking is needed to properly adjudicate plaintiff's antitrust claims. As has been previously stated, plaintiff's claims amount to more than a "rate discrimination case." [26] The issue before this court is not whether the defendants' rates for hauling ex-lake iron ore were reasonable. The issue is whether defendants violated sections 1 and/or 2 of the Sherman Act by conspiring to eliminate Pinney Dock as a competitor and by seeking to monopolize the business of providing dock services for the handling of ex-lake iron ore. The antitrust issues must be decided on the merits in a district court. Since the ICC has neither the jurisdiction nor the unique expertise to decide the antitrust issues before this court, reference to the Commission is deemed unnecessary and inexpedient. Therefore, defendants' motion to refer this case to the ICC is overruled.

## VI.

Treating the several motions as Rule 56 summary judgment motions, it is concluded that there are genuine issues of material fact as to the issues raised in these motions. On the basis of the grounds raised in these motions, defendants are not entitled to judgment as a matter of law.

IT IS SO ORDERED.

### On Reconsideration

On June 21, 1983, this court overruled separate dismissal motions which challenged this court's jurisdiction. Filed by defendants Baltimore & Ohio Railroad Company (B & O), Chesapeake & Ohio Railway Company (C & O), CSX Corporation, Chessie Systems, Inc. (sometimes collectively referred to as Chessie), Norfolk & Western Railway Company (N & W), and Bessemer & Lake Erie Railroad Company (B & LE), these motions were treated as Rule 56 summary judgment motions. Defendants Norfolk and Western Railway Co. and Bessemer and Lake Erie Railroad, move for reconsideration of the court's order, or in the alternative, for certification of immediate appellate review pursuant to 28 U.S.C. § 1292(b). The other defendants also seek such certification.

---

**25.** Defendants argue that the court should refer this case to the ICC under *United States Navigation Co. v. Cunard Steamship Co.,* 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932), and *Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952). As the Court made plain in *Carnation Co. v. Pacific Conference,* 383 U.S. 213, 220, 86 S.Ct. 781, 785, 15 L.Ed.2d 709 (1966):

Those cases merely hold that courts must refrain from imposing antitrust sanctions for activities of debatable legality under the Shipping Act in order to avoid the possibility of conflict between the courts and the Commission.

Since the conspiracy alleged in this case will, if proven, not be debatably legal under the Inter-

state Commerce Act, there is no possibility of conflict between the court and the Commission.

**26.** Defendants argue that plaintiff is precluded from seeking relief under the antitrust laws because it could have sought relief for any unfair rates from the ICC. However, "[t]he rights which [plaintiff] claims under the antitrust laws are entirely collateral to those which [plaintiff] might have sought under the [Interstate Commerce Act]." *Carnation Co. v. Pacific Conference,* 383 U.S. 213, 224, 86 S.Ct. 781, 787, 15 L.Ed.2d 709 (1966). Plaintiff's alleged failure to pursue any potential ICC remedies does not prevent it from seeking antitrust damages based on a conspiracy to eliminate it as a competitor.

## I.

The court takes up N & W's argument, repeated from its jurisdictional brief:

Quite apart from the fact that the conduct alleged in the Complaint is [expressly] immune from the operation of the antitrust laws, the Interstate Commerce Commission has exclusive jurisdiction over the subject matter of the complaint.

N & W correctly notes that the court incorrectly included N & W within the court's statement that "each defendant argues that alleged activities underlying plaintiff's claims are ... impliedly immunized from the antitrust laws by the Interstate Commerce Act...." While the other defendants made the implied immunity argument, N & W did not. In part I of its June 21 jurisdiction opinion (cited as Jur.Op.), this court stated that it first addressed "defendants' separate but parallel contentions that 'the complaint should be dismissed because the matters at issue are within the exclusive jurisdiction of the Interstate Commerce Commission.'" However, this court then treated defendants' argument "more precisely" as a contention that "the existence of the Interstate Commerce Act impliedly immunizes them from plaintiff's present antitrust action." Hence the court did not directly deal with the "exclusive jurisdiction" argument of N & W and other defendants.

In *U.S. Nav. Co. v. Cunard S.S. Co.*, 284 U.S. 474, 478–79, 52 S.Ct. 247, 248, 76 L.Ed. 408 (1932), the Court observed that the district court dismissed the "amended bill on the ground, principally, that the matters complained of were within the exclusive jurisdiction of the United States Shipping Board, under the Shipping Act of 1916," 46 U.S.C. §§ 801–42. The Court stated that the Shipping Act bore "a relation to common carriers by water substantially the same as that borne by the Interstate Commerce Act to interstate common carriers by land." *Id.* at 480–81, 52 S.Ct. at 248–49. The Court drew upon its Interstate Commerce Act decisions in sustaining dismissal of the amended bill. The plaintiff's complaint had sought "to enjoin respondents from continuing an alleged combination and conspiracy in violation of the Sherman Antitrust Act."

For guidance in dealing with the jurisdiction question, this court turns directly to decisions which relate to the Interstate Commerce Act (formerly called the Act to Regulate Commerce), rather than to the Shipping Act (*Cunard*), or to other administrative acts.[1]

The oft-cited case of *Texas & Pac. Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), lodged jurisdiction under the Interstate Commerce Act primarily in the Interstate Commerce Commission. The oil company sued the railway in state court and recovered damages on its claim that it had paid an unjust and unreasonable rate on shipments of cottonseed. The rate charged was fixed by the duly published and filed rate sheet. The Interstate Commerce Commission had not found

1. In this memorandum the court does not analyze Supreme Court exclusive jurisdiction decisions advanced by N & W and other defendants which arise under other statutes. While each of the following principal cases involves a holding that the particular administrative agency under consideration had exclusive primary jurisdiction over the plaintiff's claims, although antitrust claims were asserted, this court determines that this court's ruling on N & W's exclusive jurisdiction arguments should rest upon cases decided under the Interstate Commerce Act. *United States Navigation Co. v. Cunard S.S. Co., supra* (affirmed dismissal of an antitrust action. "The remedy is that afforded by the Shipping Act, which to that extent, supersedes the antitrust laws" and "[t]he matter, therefore, is within the exclusive preliminary jurisdiction of the Shipping Board"); *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) (United States, charging antitrust violations, obtained injunctive divestiture relief against Pan American in the District Court. The Court reversed, concluding that the complaint should have been dismissed since "the narrow questions presented by this complaint have been entrusted to the Board [Civil Aeronautics Board under the Civil Aeronautics Act]"); *Hughes Tool Co. v. Trans World Airlines*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 reh. denied, 410 U.S. 975, 93 S.Ct. 1434, 35 L.Ed.2d 707 (1973) (ordered dismissal of an antitrust action because authority over the activities alleged was vested in the Civil Aeronautics Board by the Federal Aviation Act).

888

the rate to be unreasonable. The Texas Court of Civil Appeals affirmed the judgment, but the Supreme Court reversed it.[2]

The Court ultimately held that a shipper who seeks reparation predicated upon the unreasonableness of the established rate "must, under the act to regulate commerce, *primarily* invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule, because the rates fixed therein are unreasonable." *Id.* at 448, 27 S.Ct. at 358 (emphasis added).[3]

*Terminal Warehouse v. Penn R. Co.,* 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827 (1936), dealt with the interplay of remedies under the antitrust laws and the Interstate Commerce Act. From 1887 to 1931 Pennsylvania and Merchants contracted with reference to warehouses of Merchants located close to Pennsylvania's tracks and terminals. Pennsylvania agreed to maintain tracks adjacent to each of the warehouses and to make stipulated payments

"for services rendered by the warehouse in the receipt and delivery of freight." *Id.* at 504, 56 S.Ct. at 547. Pennsylvania agreed to not allow "for such services to any other warehouse company in the City of Philadelphia." *Id.* In return, Merchants agreed to prefer Pennsylvania over other lines in the use of Merchant's facilities, to perform loading and unloading services and to collect and remit charges on incoming freight.

The Court noted that the substance of "the whole arrangement was set forth in the tariffs of the railroad filed with the Interstate Commerce Commission and open to the public." *Id.* at 504, 56 S.Ct. at 547. Confirming the arrangement in successive decisions, the Commission assumed that "the railroad in making payments or allowances for the handling of the freight was paying for transportation services rendered by an agent." In 1928 the Commission reheard and overruled one of those cases, *McCormick Warehouse Co. v. Pennsylvania R. Co.,* 148 I.C.C. 299. The Commission announced "that a warehouse company doing business under such a contract

---

**2.** The Court pointed out that "[t]he Act made it the duty of carriers ... to charge only just and reasonable rates." It noted that the Act "forbade all unjust preferences and discriminations, made it unlawful to depart from the rates in the established schedules until the same were changed as authorized by the Act." *Id.* at 437, 27 S.Ct. at 354.

Section 8 of the Act provides liability in damages for violations of the Act. Section 9 permits the person or persons "claiming to be damaged by any common carrier subject to the provisions of [the Act] ... to either make complaint to the Commission ... or [to] bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of [the Act] in any district court of the United States...."

The Court concluded that despite this choice of two remedies,

it inevitably follows from the context of the act that the independent right of an individual originally to maintain actions in court to obtain pecuniary redress for violations of the act conferred by the ninth section must be confined to the redress of such ways, as can, consistently with the context of the act, be redressed by courts without previous action by the Commission, and, therefore, does not imply the power in a court to primarily hear complaints concerning wrongs of the character here complained of.

*Id.* at 442, 27 S.Ct. at 356.

**3.** In *Great Northern Ry. Merchants Elev. Co.,* 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1921), Justice Brandeis classified cases decided by federal and state courts in which the issue of the primary jurisdiction of the Interstate Commerce Commission was adjudicated. In the listed cases "in which the jurisdiction of the court was sustained without preliminary resort to the Commission, the question involved was solely one of construction of a tariff or otherwise a question of law, and not one of administrative discretion." In a second list (headed by *Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., supra* ) were cases "where the court refused to take jurisdiction because there had not been preliminary resort to the Commission, the question presented either was one of fact or called for the exercise of administrative discretion." In *Great Northern Ry.,* as distinguished from *American Tie & Timber Co.,* 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255 (1914), the Court noted that "no fact, evidential or ultimate," was in controversy and there was "no occasion for the exercise of administrative discretion." Since the "task to be performed" was "to determine the meaning of the words of the tariff which were used in their ordinary sense and to apply that meaning to the undisputed facts," the Court affirmed the decision of the court below (Supreme Court of Minnesota).

was consignor or consignee, acting on its own behalf and not as agent for the carrier." As a result, the railroad payments or allowances became "discriminatory" and "forbidden and unlawful" in violation of 49 U.S.C. § 3(1). *Id.* at 505, 56 S.Ct. at 547.

Terminal filed a complaint with the Commission and charged Pennsylvania with "unjust discrimination". The Commission granted remedial injunctive relief against Pennsylvania, as requested, but refused Terminal "an award of reparation," because the evidence was "far too vague and indefinite to warrant the conclusion that complainants have suffered actual pecuniary loss attributable directly to the alleged unlawful practices." *Id.* Merchants and other affected warehouses filed bills of complaint in district court against the Commission to vacate the injunctive order. A three-judge court dismissed the bills of complaint, and the Court affirmed the decree of dismissal. *Merchants Warehouse Co. v. United States*, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227 (1931).

Denied reparation by the Commission, Terminal brought suit in district court against both Pennsylvania and Merchants Warehouse. Based on the Sherman and Clayton Acts, plaintiff alleged "an unlawful combination in restraint of trade and commerce." On appeal from the district court judgment for trebeled damages, the Third Circuit Court of Appeals reversed on the ground that the decision of the Commission refusing reparation was a bar to any claim for damages against either of the defendants in an antitrust damage action as well as under the Commerce Act. While the Court agreed with the Third Circuit (*Pennsylvania R. Co. v. Terminal Warehouse*, 78 F.2d 591 (1935)) that the denial of reparation against the carrier was "conclusive evidence in favor of the carrier," it was "not such evidence for the carrier's confederate." Since Terminal had not included Merchants as a party to the ICC complaint, although the Court observed that it might have done so, the Court chose to rest its judgment on "grounds applicable to both defendants." 297 U.S. at 511, 56 S.Ct. at 550.

After reviewing its decisions in *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), and in *United States Navigation Co. v. Cunard Steamship Co.*, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932), the Court in *Terminal Warehouse* stated that "[w]hat was said in these opinions is precisely applicable here." 297 U.S. at 513, 56 S.Ct. at 551. Citing *Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., supra, Great Northern Railway Co. v. Merchants Elevator Co., supra,* and other decisions of the Court, the Court declared that "[i]f a sufferer from the discriminatory acts of carriers by rail or by water may sue for an injunction under the Clayton Act without resort in the first instance to the regulatory commission, the unity of the system of regulation breaks down." 297 U.S. at 513, 56 S.Ct. at 551. Holding that "the same considerations are applicable with undiminished force" in a suit under the Clayton Act for damages, the Court continued:

> Certain then it is that the Anti-Trust Laws are inapplicable in all their apparent breadth to carriers by rail or water. A consignor or consignee aggrieved by such a wrong must resort to the appropriate administrative agency, at least for many purposes. If he is remitted to the Commerce Act or the Shipping Act to cancel the illegal preference, may he pass over those acts and revert to the Clayton or the Sherman Act for the purpose of recovering damages? The Commerce Act like the Shipping Act embodies a remedial system that is complete and self-contained. It provides the means for ascertaining the existence of a preference, but it does not stop at that point. As already shown in this opinion, it gives a cause of action for damages not only against the carrier, but also against shippers and consignees who have incited or abetted. For the wrongs that it denounces it prescribes a fitting remedy which we think, was meant to be exclusive. If another remedy is sought under cover of another statute, there must be a showing of another wrong not

canceled or redressed by the recovery of damages for the wrong explicitly denounced.

*Id.* at 514, 56 S.Ct. at 551.

██ N & W urges that the Supreme Court in *Terminal Warehouse* thereby held that "antitrust damages were available only in cases for which the Interstate Commerce Act did not provide a remedy." This court disagrees. Rather, the Court is understood to be saying that the Interstate Commerce Act provides an exclusive remedy for a consignor or consignee of freight who claims that a carrier by rail is giving an illegal preference to another consignor or consignee and who seeks to cancel the preference and obtain reparation (damages) from the carrier and any aider and abettor because of the preference.

The Court made clear that it was not saying that "never in any circumstances can a carrier become a party to a conspiracy in restraint of trade or commerce with liability for treble damages." *Id.* at 515, 56 S.Ct. at 552. The Court gave an example of an actionable conspiracy and stated that "[i]f a carrier were to give a preference in furtherance of that conspiracy, it would become a participant therein, or so we may assume, the damages being measured not merely by the consequences flowing from the preference, but by those flowing from the conspiracy in all its comprehensive unity." *Id.* at 516, 56 S.Ct. at 552. The Court

found "no conspiracy to monopolize the storage business to the destruction of Terminal or of others similarly situated." *Id.* To the contrary,

[t]he history of the relation between *Pennsylvania* and *Merchants* indicates strongly that the illegal discrimination, far from being a symptom of a larger combination, was the product of a mistake of law, which was shared for many years by the regulatory commission till the decision in McCormick's case laid down another rule.

*Id.* These specific findings that no conspiracy had been proved has the effect of limiting *Terminal's* holding to the facts of that case. Hence, the scope of the holding of *Terminal* is not as broad as this language suggests:

The Commerce Act ... embodies a remedial system that is complete and self-contained ... For the wrongs that it denounces it prescribes a fitting remedy which, we think, was meant to be exclusive.

*Id.* at 514, 56 S.Ct. at 551.

██ This court concludes that *Terminal* does not hold that the Interstate Commerce Act provides an exclusive remedy for pressing antitrust claims against carriers. Therefore, the Interstate Commerce Commission does not have exclusive jurisdiction to hear and determine plaintiff's present claims.[4] The plaintiff may seek a

---

4. A case decided after this court's jurisdiction order, *Transkentucky Transportation Railroad v. Louisville and Nashville R.R. Co.*, 1983–2 Trade Cases, ¶ 65,476 (E.D.Ky.1983), supports this court's decision on the issue of exclusive jurisdiction. In that case, plaintiffs (referred to as TTI), were corporations engaged in the business of transporting coal from central Kentucky to the Ohio River. Plaintiffs sued several railroads, alleging that defendants sought to monopolize the transportation of Kentucky coal in violation of the antitrust laws. Plaintiffs alleged that defendants violated the Sherman Act by refusing to set rates for some shippers attempting to use the TTI project; by establishing rates and charges designed to discriminate against TTI and to exclude it from the marketplace; by refusing to provide access to TTI's proposed terminal site at Charleston Bottoms; and by instituting sham proceedings before the KRC [Kentucky Railroad Commis-

sion], ICC and Kentucky courts designed to harass and impede plaintiffs.

Defendants in *Transkentucky* attempted to characterize plaintiff's antitrust claims as an attack on the level of defendants' rates; defendants argued that since rates are actively regulated by the ICC and KRC, and are within the exclusive jurisdiction of those agencies, the court must dismiss those claims.

The court rejected defendants' arguments on implied immunity and found that neither the ICC nor KRC approved the rates in question. With respect to defendants' arguments on exclusive jurisdiction, the court reasoned:

[T]he regulatory and antitrust regimes are not in conflict in this case because this action is not a challenge to the *level* of defendants' rates and charges, as defendants contend. Defendants misconstrue the very nature of plaintiffs' complaint in an effort to place its allegations squarely within the exclusive juris-

"remedy … under cover of" the Sherman and Clayton Antitrust Acts. Pinney alleges "another wrong, not canceled or redressed by the recovery of damages for the wrong [of unlawful discrimination] … explicitly denounced" in the Interstate Commerce Act. Specifically, Pinney alleges that the defendants conspired to eliminate it as a competitor in order to monopolize the business of providing dock services for the unloading of ex-lake iron ore.[5]

## II.

In *Keogh v. C & N W. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), plaintiff, a manufacturer and interstate shipper of its products, sought damages against eight railroad companies and 12 individuals under the Sherman Act. Plaintiff Keogh sued for damages to the extent of the difference in rates between certain uniform freight rates and "those which would have been paid under rates prevailing before September 1, 1912, and which, but for the conspiracy, would have remained in effect." Keogh held that private shippers may not recover damages under section 7 of the 1890 Antitrust Act because they lost the benefit of rates which could have been lower but for the conspiracy. The shippers were limited to the remedy for damages provided under sections 8 and 9 of the Interstate Commerce Act. The Court stated that

> the legal rights of shipper as against carrier in respect to a rate are measured

diction of the ICC and KRC. Plaintiffs do not ask the Court simply to find specific rates to be unreasonably high and to lower them retroactively to reasonable levels. *Cf. Keogh v. Chicago & Northwestern Ry. Co., supra.* Instead, plaintiffs seek to establish that defendants engaged in a broad pattern of conduct, including but not limited to the manipulation of rates, specifically designed to destroy the TTI project as a competitor. Damages would be measured not by the difference between the existing rates and some hypothetical rate, but by the business losses plaintiffs have sustained. Plaintiffs' complaint does not put in issue the lawfulness of defendants' rates and charges under the Interstate Commerce Act. *Id.* at 68,306. Continuing, the court concluded:

> These claims under the Sherman Act do not fall within the jurisdiction, exclusive or otherwise, of the ICC and KRC. Although the ICC does consider antitrust principles in determining the reasonableness of rates, the agency lacks authority to enforce the antitrust laws or even to determine if they have been violated. See, *e.g.*, *McLean Trucking Co. v. United States* [1944–1945 Trade Cases ¶ 57,203], 321 U.S. 67, 79, 64 S.Ct. 370, 376, 88 L.Ed. 544 (1944)....

*Id.* (further citations omitted).

N & W argues that the court in *Transkentucky* found controlling the fact that defendants alleged actions occurred after the Staggers Act. This court does not agree. Although the *Transkentucky* court discussed the Staggers Act, it did not rely on this Act in making its ruling on the exclusive jurisdiction arguments. Indeed, it is not clear whether all of the actions underlying the alleged antitrust violations occurred before or after the 1980 enactment of the Staggers Act.

**5.** In a footnote, B & LE observes that "allegations of predatory railroad rate activity which

might otherwise implicate the antitrust laws are part and parcel of the ICC's exclusive regulatory jurisdiction." Among the cases cited in support are three-judge district court decisions which set aside ICC orders involving "intermodal competition." However, in none of these cases is it understood that the ICC sought to adjudicate an antitrust claim brought by one mode of transportation against another mode of transportation, let alone an antitrust conspiracy charge. The closest to that type of situation is elucidated in *Lake Carriers Ass'n v. United States*, 399 F.Supp. 386, 391–92 (N.D.Ohio 1975). In *Lake Carriers* the court declared:

> Here, the railroads have employed their monopoly powers to eliminate any effective competition by Lake Carriers which want to utilize unit-train service. If this dispute arose outside the strictures of the Interstate Commerce Act, the actions of the railroads might well amount to violations of the anti-trust laws.... If the railroads secured and maintained the business of Consumers Power Company and Detroit Edison Company on the basis of better service or lower lawful rates alone, the Lake Carriers could not legally complain. But here, the railroads' refusal to provide some type of unit-train service to the Lake Erie ports, with appropriate rates, constitutes an unfair competitive practice. In the Court's opinion, such a restriction upon competition is clearly contrary to the public interest.

This court does not equate the railroads' refusal to provide the Lake Carriers with some type of unit-train service to the Lake Erie ports (found by the court to be "an unfair competitive practice") with the presently alleged "conspiracy to eliminate a competitor and monopolize an industry."

by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.

*Id.* at 163, 43 S.Ct. at 49. The Court explained:

This stringent rule prevails because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated. If a shipper could recover under section 7 of the Anti-Trust Act for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors.

*Id.*

Stressing shipper remedies against carriers, these principal reasons for the *Keogh* holding, considered anew, make *Keogh* inapplicable to plaintiff's claims. As held before, "it cannot be said that plaintiff will unfairly benefit in its status as a competitor of the railroads if it is permitted to recover damages resulting from a conspiracy by those very same competitors to

drive it out of business and monopolize the industry." [6]

As an additional reason for its holding, *Keogh* states:

The character of the issues involved raises another obstacle to the maintenance of the action. The burden resting upon the plaintiff would not be satisfied by proving that some carrier would, but for the illegal conspiracy, have maintained a rate lower than that published. It would be necessary for the plaintiff to prove, also, that the hypothetical lower rate would have conformed to the requirements of the Act to Regulate Commerce.

*Id.* at 163, 164, 43 S.Ct. at 49–50. Relying on this reasoning, N & W contends:

Pinney alleges damages based on business lost as a result of Conrail's rates for line haul transportation from Pinney Dock, and as a result of the handling charges in effect at various railroad docks on self-unloading vessels. Since the Interstate Commerce Commission had exclusive jurisdiction over all those rates during the entire period of alleged conspiracy, Pinney cannot logically meet its burden of proof before this court. (N & W Reconsideration Brief, p. 26.)

At other points in its reconsideration brief, N & W makes the same argument. Thus,

---

**6.** Claiming that *Keogh* applies to railroad competitors "for business allegedly lost as a result of anti-competitive railroad ratemaking," B & LE in its reconsideration brief discusses two cases cited by *Keogh* and "not addressed by this Court." Citing *Louisville & Nashville R.R. Co. v. Ohio Valley Tie Co.*, 242 U.S. 288, 37 S.Ct. 120, 61 L.Ed. 305 (1916), *Keogh* states, "If the conspiracy here complained of had resulted in rates which the Commission found to be illegal because unreasonably high or discriminatory, the full amount of the damages sustained whatever their nature would have been recoverable in such proceedings." *Ohio Valley Tie Co.* was a state damage action brought under the Interstate Commerce Act. It was not an antitrust action. Ohio Valley Tie, pursuant to section 9 of the Interstate Commerce Act, previously obtained an order of "reparation for unreasonable rates" and an order which established a reasonable future rate. The Court held that this award precluded additional compensation in the state court action for "keeping of the plaintiff out of its money, dwelt upon by the trial court, or the damage to its business." While plaintiff did

allege that the railroad's quoted rates "were done for the purpose of getting rid of the plaintiff as a competitive buyer," *id.* at 289, 37 S.Ct. at 121, this fact is not material in *Keogh* 's reference to *Ohio Valley Tie.*

The second case, *Meeker v. Lehigh Valley R.R. Co.*, 162 F. 354 (S.D.N.Y.1908), held "that a resort to the Interstate Commerce Commission is a condition precedent to the maintenance of an action in the Circuit Court of the United States to recover damages solely occasioned by the payment of excessive, unjust, or unreasonable rates for the transportation of interstate commerce, even when the exaction of such excessive rates was the result of a combination or conspiracy made unlawful by the 'Sherman antitrust law'...." A demurrer was sustained, because while the plaintiff alleged that the rates were excessive and unreasonable, it did not allege that "the rates charged and exacted have been declared excessive or unreasonable or unjust by the Interstate Commerce Commission." Primary jurisdiction, the critical basis of the *Meeker* ruling, is dealt with in part IV of this opinion.

it states at p. 27 that this court in order to award damages "must not only determine that the rates in effect were illegal under the Interstate Commerce Act, but, it must further find under the Act the line haul rates to which Pinney was entitled and the proper level of handling charges applicable to self-unloaders at railroad docks throughout the alleged period of conspiracy." It insists that "[t]hose findings are the necessary factual predicate to ascertain the amount of business allegedly lost by Pinney due to the conspiracy, yet these are [matters entrusted by Congress to the exclusive jurisdiction of the ICC pursuant to the Interstate Commerce Act]."

In its opposition brief, Pinney counters: N & W's basic premise is wrong. Pinney does not ask this Court to find any railroad tariff unreasonable or to lower the tariffs retroactively or prospectively. Instead, as this Court previously found, Pinney seeks to recover damages it suffered as a direct competitor of defendants. Slip op. at 46, 53–54.

As recently stated by the Supreme Court in *Burlington Northern, Inc. v. United States—U.S.*, 459 U.S. 131, 139, 103 S.Ct. 514, 520, 74 L.Ed.2d 311, 319 (1982), "[A] federal court has no jurisdiction to enter an order that operates to fix rates." Hence, it is plain that this court lacks the authority to rule at or before trial on the reasonableness of the applicable line-haul commodity rate, the class rate, or the dock handling charges posted in the tariffs of affected carriers that pertain to Ashtabula Harbor during the relevant period.

 As seen, plaintiff states that it "does not ask this Court to find any railroad tariff unreasonable or to lower the tariffs retroactively or prospectively." However, as N & W notes, plaintiff does not deny that its proof of damages will "involve this court in a determination, *inter alia,* that "certain tariff rates applicable to line haul from Pinney Dock and to the handling of iron ore vessels at railroad docks would, in the absence of alleged con-

spiracy, have been at levels different than their actual levels during the relevant period."

Because the reasoning of *Keogh*, 260 U.S. at 163–64, 43 S.Ct. at 49–50, is deemed to govern the plaintiff's burden of proving damages, it is evident that it is essential to ascertain before trial whether the court will be asked to determine at trial that but for the alleged illegal conspiracy, the defendant carriers would have published: (1) a line-haul rate for iron ore shipped from Pinney Dock that would have been lower than the class rate, but higher than the existing line-haul rate, and whether that hypothetical line-haul rate would have conformed to the requirements of the Interstate Commerce Act; (2) handling charges for self-unloaders unloading at Pinney Dock lower than the published handling charges for bulkers and whether that hypothetical lower rate would have conformed to the requirements of the Interstate Commerce Act.

The Court recognizes that *Keogh* declares that "by no conceivable proceeding could the question whether a hypothetical lower rate would under conceivable conditions have been discriminatory, be submitted to the Commission for determination." Although the question has not been previously addressed by the parties, it would appear that if the plaintiff intends to prove damages by establishing a hypothetical line-haul rate or hypothetical handling charges the court would lack the authority to ascertain such hypothetical rates and would not be able to refer the question to the Commission for determination. Since dismissal of the plaintiff's claim would appear to then be the only alternative, the earliest resolution of the issue is important to all parties. Hence, the court directs the plaintiff within 30 days of the date of this memorandum and order to file a written statement declaring whether or not the plaintiff, in proving damages, intends to ask the court to make any of the foregoing or similar determinations.[7]

---

7. The order is entered pursuant to Fed.R.Civ.P. 16, and its general supervisory powers over its

### III.

Defendants N & W and B & LE separately move for the court's reconsideration of its ruling that the conspiracy alleged in the instant case is expressly immunized under the antitrust laws. In its June 21, 1983 memorandum and order, this court concluded its analysis of the express immunity issue as follows:

Having examined the actual language of the Interstate Commerce Act, the pertinent legislative history, and the relevant case law, the court concludes that it should apply an analysis similar to that employed in *Aircoach* and its progeny. Since a conspiracy to eliminate a competitor cannot fall within 49 U.S.C. § 5(b)(9)'s limited grant of express antitrust immunity, plaintiff is entitled to prove its allegations that the defendants conspired to eliminate it as a competitor in order to monopolize the business of providing dock services for the unloading of ex-lake iron ore.

Jur.Op. at 43.

Both N & W and B & LE argue that section 5a of the Interstate Commerce Act, 49 U.S.C. § 5b(9), expressly immunizes the collective actions at issue in this case since these actions were taken in accordance with an approved rate bureau agreement. Further, they both argue that neither the legislative history nor the cases relied on by this court support the creation of a predatory intent exception to section 5a immunity. With respect to the court's reliance on *Atchison, Topeka & Santa Fe Railway v. Aircoach Transportation Association*, 253 F.2d 877 (D.C.Cir.1958), *cert. denied*, 361 U.S. 930, 80 S.Ct. 372, 4 L.Ed.2d 354 (1960), these defendants' arguments differ. In its reply brief, N & W argues that *Aircoach* is wrong and should not be followed. B & LE, on the other hand, argues that *Aircoach* should be read narrowly so that it does not apply to cases such as this where there was fully regulated ratemaking under the ICC's exclusive control.

docket, to define and narrow the issues and to

Both N & W and B & LE basically reiterate arguments made in their original motions. This court rejected these arguments in its ruling which followed *Aircoach* and its progeny, and which declined to read *Aircoach* as narrowly as urged by B & LE. Since this court's ruling, the D.C. Circuit decided an appeal in the criminal antitrust case arising out of the same facts as the instant one. *United States v. Bessemer and Lake Erie Railroad Company*, 717 F.2d 593 (D.C.Cir.1983) (hereinafter *Bessemer and Lake Erie*). In that criminal case, B & LE was convicted pursuant to a plea of *nolo contendere* of conspiring to inhibit or eliminate competition in violation of the Sherman Antitrust Act. By its plea of *nolo contendere* and in appealing that conviction, B & LE admitted the truth of the factual allegations in the indictment.

The D.C. Circuit court concluded that B & LE could not "rely on the immunity granted by section 5a." B & LE argued that its actions were legal because they were in conformity with a section 5a rate agreement, and that immunity cannot be voided by anticompetitive intent. Addressing that argument, the court first emphasized the limited nature of section 5a immunity, noting that the legislative history supports a limited reading of section 5a's protections. *Id.* at 599–600. The court then quoted the same language from the House Report quoted by this court:

The bill leaves the antitrust laws to apply with full force and effect to carriers, so far as they are now applicable, except as to such joint agreements or arrangements between them as may have been submitted to the [ICC] and approved by that body.... [H.R.Rep. No. 1100, 80th Cong. 1st Sess. 5 (1947).]

*Id.* at 600; Jur.Op. at 26.

The court in *Bessemer and Lake Erie* reviewed *Aircoach*, in which a group of railroads claimed that their practice of submitting joint bids for military transport business was immunized by section 5a "even though a desire to eliminate competition from airlines allegedly underlay the

ready the case for trial.

joint bid system." 717 F.2d at 600. The D.C. Circuit court noted that the court in *Aircoach* rejected their claim by stating:

> Even though it should be found in the end that the practices as such have been validly immunized by section 5a approved agreements, nevertheless, if they are part of an effort by Railroads in combination or conspiracy to eliminate the competition of Aircoach, rather than used merely to meet that competition, the practices would be removed from the protection of section 5a(9). We do not think the Act or any agreement which has been approved under it can be construed as authorizing the use of such practices for the purpose of eliminating the competition of Aircoach for the section 22 transportation involved.

*Id.* Responding to B & LE's argument that *Aircoach* does not apply to this case, but only to cases where the rates involved are not subject to ICC remedial jurisdiction, the court stated:

> Even if we were to adopt appellant's limiting reading of *Aircoach*, the appellant's argument would not succeed on the facts of this case. The offense charged in this case is not subject to ICC remedial jurisdiction. The government does not seek to amend the 5a rate agreement or to alter prospectively the rates set by the 5a rate bureau; it seeks to punish an illegal antitrust combination which happened to employ a rate bureau. The ICC is not equipped to "remedy" criminal violations of the antitrust laws.

*Id.* The court continued:

> The statutory language, the legislative history, and the case law all point to the same conclusion: the section 5a immunity reaches only those actions actually taken "in conformity with" the rate agreement and the terms and conditions laid down by the ICC. It does not sweep within it a larger conspiracy which utilizes a section 5a rate bureau as a means to an end; it does not legitimize illegal schemes which happen to coincide at

points with the legitimate actions or a rate bureau.

*Id.*

Applying this law to the facts, the court in *Bessemer and Lake Erie* first pointed out that the indictment did not "attack the rate bureau itself," but alleged that some members of the rate bureau entered into a separate agreement which only incidentally touched the setting of rates. Next, the court noted that this separate conspiracy was distinguished from the rate bureau by more than mere purpose or "intent;" several of the actions taken by this conspiracy "were not 'in conformity with' the rate bureau's 5a rate agreement." *Id.* at 601.

One of the procedurally inconsistent actions alleged was defendants' quotation of the same dock handling charges for self-unloaders and bulkers, even though the services were not to be performed. The court stated:

> The crux of this charge is that handling the self-unloaders represented a significantly different type of service. Rather than promulgating à new rate for this new service in accordance with ICC requirements, the conspirators shielded the new joint rate from ICC scrutiny.

*Id.* One of the "substantively inconsistent" acts alleged was defendants refusal to lease railroad dock space to Litton for handling iron ore from the self-unloaders. According to the court, "[s]uch an agreement purports to regulate a subject matter—services available to customers—not within the scope of a section 5a agreement." *Id.* Finally, as one of the alleged acts that had nothing to do with the section 5a rate agreement, the court pointed to the allegation that the conspirators sought to eliminate the trucking of iron ore from a private dock.

The instant case closely parallels its criminal analogue and, concomitantly, a parallel analysis can be made. Like the indictment, Pinney's first amended complaint does not "attack the rate bureau itself." Indeed, not mentioning the rate bureau, it alleges a separate conspiracy to eliminate Pinney as a competitor. Addi-

tionally, this separate conspiracy can also be distinguished by more than mere "intent," for several of the actions allegedly taken by the conspiracy were not "in conformity with" the 5a rate agreement.

In its first amended complaint, among other things, Pinney alleges that defendants, "[d]eliberately and purposefully foreclos[ed] Pinney Dock's development as an iron ore handling facility by deliberately and intentionally preventing and postponing the construction and use of the self-unloading vessels which Pinney Dock was designed to serve." This was accomplished by: "(1) the refusal to handle self-unloading vessels at docks owned or operated by defendants and their coconspirators; and (2) the imposition of artificial, arbitrary and unjustifiable dock handling charges on iron ore discharged from self-unloading vessles...." Taken together, these allegations cover the same subject matter and would permit trial proof (in the present record), as alleged in the indictment, that "in furtherance of the aforesaid combination and conspiracy the defendants and unindicted co-conspirators ... quot[ed] the same charges for handling iron ore from self-unloaders as from bulkers even though services identified in the applicable tariffs were not performed." As previously noted, the D.C. Circuit found:

> The crux of this charge is that handling the self-unloaders represented a significantly different type of service. Rather than promulgating a new rate for this new service in accordance with ICC requirements, the conspirators shielded the new joint rate from ICC scrutiny.

The allegations of plaintiff's complaint and the proof in the present record represent a similar claim by the plaintiff of non-conformity with section 5a requirements.

Pinney's complaint also alleges actions which are substantively inconsistent with the section 5a rate agreement. As noted above, in *Bessemer and Lake Erie* the court found the allegations pertaining to defendants' refusal to lease dock space to Litton to be substantively inconsistent because that action purported to regulate ser-

vices available to customers, a subject matter not within the 5a agreement. Pinney does not and could not charge that a refusal to deal with Litton was an act that would cause injury to Pinney. Yet, in proving its conspiracy charge against the defendants, it would be relevant for Pinney to offer evidence that the defendants refused to lease railroad dock space to Litton Industries for the handling of iron ore from self-unloaders. The D.C. Circuit refused to accept B & LE's argument that "the refusal to lease dock space was merely 'ancillary' to the rate structure" and therefore found this act of refusal was inconsistent with the substantive requirement of section 5a that "joint agreements be limited to rates."

The D.C. Circuit also rejected the argument that "the scheme to terminate the competitive trucking service in fact turned on ratemaking—a member of the conspiracy offered to haul iron ore from the private dock at a lower rate if the truckers were denied access." 717 F.2d at 602. The court held that "[t]he immunity granted by 5a does not extend to bald attempts to use the rate-setting process to blackball competitors." *Id.* In its jurisdiction opinion, this court similarly noted that "plaintiff may also attempt to prove its allegation that defendants conspiratorially harassed it in its attempts to truck iron ore from its dock, subject to the limitations imposed by *Eastern Railroads President Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)." Jur.Op. at 62–63.

■ In sum, this court agrees with the holding of the D.C. Circuit that section 5a immunity reaches only these actions taken "in conformity with" the rate agreement. As stated by the court in *B & LE*, section 5a immunity "does not legitimize illegal schemes which happen to coincide at points with the legitimate actions of a rate bureau." Similarly, as stated by this court in its jurisdiction order, a section 5a agreement cannot serve to immunize an alleged

"later 'agreement' to eliminate a competitor and monopolize a market."[8]

## IV.

Turning to another aspect of jurisdiction, N & W and B & LE, relying on the doctrine of primary jurisdiction, ask the court to refer the case to the Interstate Commerce Commission. Since this court entered its jurisdiction opinion on June 21, 1983, the doctrine of primary jurisdiction was determined to be inapplicable in the criminal analogue of the present case, *supra.* The court of appeals affirmed defendant B & LE's entry of a plea of *nolo contendre* to the indictment, which charged the appellant and other rail carriers under the Sherman Antitrust Act with conspiring to inhibit or eliminate competition. As *amicus*, N & W urged referral "so that the ICC can examine the issues of intent, compliance with 5a procedures, and the scope of 5a immunity." The court declined to do so. It declared:

> Put simply, the time for urging the doctrine of primary jurisdiction has passed in this case. As we have discussed, the entry of the *nolo* plea bars all issues but those involving subject matter jurisdiction and the legal sufficiency of the indictment. Primary jurisdiction is not such an issue.

Elucidating, the court stated:

> The doctrine of primary jurisdiction, despite what the term may imply, does not speak to the jurisdictional power of the federal courts.... We may not now sec-

ond guess whether the trial judge used his discretion wisely.

In this civil case, still at the trial court level, the doctrine of primary jurisdiction remains a timely issue. Although the motion of the defendants for reference of the case to the ICC was overruled in the jurisdiction opinion, the applicability of the doctrine of primary jurisdiction will be reconsidered.

In *United States v. Western Pac. R. Co.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), the Court reviewed a court of claims summary judgment in favor of three railroads in a Tucker Act suit against the United States. The court of claims held that the shipments in question were "incendiary bombs" under the meaning of the applicable tariff. Therefore, the railroads were entitled to the higher first class rate. In reversing the judgment and remanding the case, the Court concluded that "in the circumstances here presented the question of tariff construction, as well as that of the reasonableness of the tariff as applied, was within the exclusive primary jurisdiction of the Interstate Commerce Commission." *Id.* at 63, 77 S.Ct. at 164.

Determining when the "doctrine of primary jurisdiction" should be applied in effectuating the purposes of the Interstate Commerce Act, the Court said it "depends on whether the question raises issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by that Act."[9] *Id.*

---

**8.** Defendant N & W attributes to the court the misconception that section 5a immunity provisions were inapplicable to defendants' actions "because the particular rate bureau proceedings in which such action was taken were not submitted to the ICC for its approval." B & LE makes a similar argument. Respectfully, this does not reflect this court's understanding of section 5a immunity provisions. It is recognized that the parties to a carrier agreement, approved by the ICC pursuant to 49 U.S.C. § 5(b)(2) are, pursuant to § 5(b)(9), "relieved from the operation of the antitrust laws ... with respect to the carrying out of such in conformity with its provisions...." If "conformity with [section 5a's] provisions" occurred, then immunity attaches to the joint action. But immunity

does not attach if conformity was lacking either as to procedural or substantive requirements of section 5a. The point sought to be made in the court's jurisdiction opinion (as quoted from pages 866–67), is that ICC approval of the Eastern Railroad § 5a Agreement cannot serve to immunize the alleged "later 'agreement' to eliminate a competitor and monopolize a market." Such an agreement, as alleged, surely could not be in conformity with section 5a's substantive rate-making provisions.

**9.** The Court harked back to *Texas & Pacific R. Co. v. American Tie & Timber Co.,* 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255 (1914) ("the courts must not only refrain from making tariffs, but, under certain circumstances, must decline to

Guided by these principles prescribed for determining when questions should be referred to the Interstate Commerce Commission,[10] the court will separately consider two questions urged for reference.

### A.

■ The court first considers whether this court should refer to the ICC the issue of the intent and effect of defendants' rate actions. In its motion for reconsideration, N & W noted that this court followed *Atcheson, Topeka & Santa Fe Ry. Co. v. Aircoach Transport Association*, 253 F.2d 877 (D.C.Cir.1958). Based on this, N & W contends:

> If the *Air Coach* approach is adopted, section 5a applies to protect each defendant from liability based on its participation in rate bureau communications unless it is found to have engaged in such activities with the specific intent to eliminate the plaintiff as a competitor. Thus, the dominant issue to be decided at trial is the intent of the defendants in engaging in such activities.[FN] [Footnote omitted.]

In support of its argument for referral, N & W cites *Atlantic Coast Line Ry. Co. v. Riss & Co.*, 267 F.2d 657, 658–69.

Similarly, B & LE takes issue with this court's refusal to refer any issue with respect to defendants' intent to the ICC, arguing that "such referral is mandated under the *Aircoach* doctrine (as modified by

the court of appeals in *Riss, supra*), upon which the Court otherwise relied." [11] B & LE then proceeds with a lengthy survey of what it deems to be the relevant regulatory law. Based on this, B & LE submits

> that the alleged restrictive linehaul tariffs as well as defendants' alleged maintenance of a uniform handling charge structure—and defendants' alleged intent in doing so—would indeed very likely have been held lawful under the Interstate Commerce Act, notwithstanding that they may not have conformed to the competitive norm of the antitrust laws.

B & LE's latter argument ignores the critical language in *Aircoach*, quoted in this court's jurisdiction order at 28–29:

> Even though it should be found in the end that the practices as such have been validly immunized by section 5a approved agreements, nevertheless, if they are part of an effort by Railroads in combination or conspiracy to eliminate the competition, of Aircoach rather than used merely to meet that competition, the practices would be removed from the protection of section 5a(9). We do not think the Act or any agreement which has been approved under it can be construed as authorizing the use of such practices for the purpose of eliminating the competition of Aircoach from the section 22 transportation involved.

*Aircoach, supra*, at 887. Thus, even if B & LE were correct in stating that defend-

---

construe them as well...."); and *Great Northern R. Co. v. Merchants Elevator Co*, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922). If "the question is simply one of construction, the courts may pass on it as an issue 'solely of law.'" However,

> where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that "the enquiry is essentially one of fact and of discretion in technical matters," then the issue of a tariff application must first go to the Commission.

*Id.*, 352 U.S. at 65, 77 S.Ct. at 165.

Relying on *United States v. Western Pac. R. Co.*, the Court held in *ICC v. Atlantic Coast Line R. Co.*, 383 U.S. 576, 579–80, 86 S.Ct. 1000, 1003–04, 16 L.Ed.2d 109 that "a shipper who commences his section 9 reparation proceeding in the District Court will nevertheless be re-

quired to repair to the Commission for decisions of issues, like the reasonableness of rates, which call the primary jurisdiction doctrine into play."

**10.** The "referral" procedure is explicated in *Nader v. Allegheny Airlines*, 426 U.S. 290, 307, 96 S.Ct. 1978, 1988, 48 L.Ed.2d 643, as that of the court staying the case "pending reference to the Board."

**11.** In its memorandum in support of its "summary judgment or, alternatively, referral motion," B & LE, as the first question for requested referral to the ICC, stated: 1. whether defendants' rate actions were motivated by predatory intent or by other consideration such as carrying out obligations under the Interstate Commerce Act.

ants' activities with respect to the alleged restrictive line-haul tariffs and handling charges would probably have been found to be lawful under the ICA, under *Aircoach* these actions may still be subject to anti-trust liability if part of a conspiracy to eliminate Pinney as a competitor.

The defendants are correct in arguing that the D.C. Circuit modified *Aircoach* in *Riss, supra,* but this court respectfully disagrees with their contention that this modification mandates referral of the intent issue to the ICC. In *Riss,* the court of appeals held that *Federal Maritime Board v. Isbrandtsen Co.,* 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958), modified *Aircoach* by imposing the following requirement:

> [T]he issue of the intent and effect of an agreement approved by the Commission must, in a case where such issue is the sole or dominant issue in the case, first be referred to the Commission prior to a court determination of whether such agreement violates the anti-trust laws....

*Riss, supra,* at 658. However, the *Riss* court also held that *Isbrandtsen*

> does not necessarily require referral to the Commission of issues ... where the agreement is only one of a considerable number of overt acts alleged and where the policy favoring referral is clearly outweighed by other factors such as the probability of undue delay and the overriding importance of early consideration of the other overt acts alleged....

*Id.* The court of appeals remanded the case to the district court with directions to vacate its previous order and reconsider petitioner's motion for reference in light of *Isbrandsten.*

In *Isbrandtsen,* the Federal Maritime Board approved a dual rate system proposed by a shipping conference. The Court of Appeals set aside the Board's order, and the Supreme Court affirmed. The Court held that since the Board found that the dual-rate contract was a necessary competitive measure required to meet the competition, this contract was a resort to discriminating or unfair methods in violation of the Shipping Act. After analyzing the applicability of *Cunard, supra,* and *Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), the Court concluded:

> It is, therefore, very clear that these cases, while holding that the Board had primary jurisdiction to hear the case in the first instance, did not signify that the statute left the Board free to approve or disapprove the agreements under attack. Rather, those cases recognized that in certain kinds of litigation practical considerations dictate a division of functions between court and agency under which the latter makes a preliminary, comprehensive investigation of all the facts, analyzes them, and applies to them the statutory scheme as it is construed. Compare *Denver Union Stock Yard Co. v. Producers Livestock Marketing Assn., ante,* [356 U.S.] p. 282 [78 S.Ct. 738, 2 L.Ed.2d 771]. It is recognized that the courts, while retaining the final authority to expound the statute, should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern. Cases are not decided, nor the law appropriately understood, apart from an informed and particularized insight into the factual circumstances of the controversy under litigation.

356 U.S. at 498, 78 S.Ct. at 861.

After *Riss* was remanded to the district court, Judge Sirica carefully analyzed the effect of *Isbrandtsen* on *Aircoach.* Upon reviewing the *Isbrandsten* decision, Judge Sirica noted: "it is clear that the problem of whether or not a district court should refer certain issues to an administrative agency was not squarely before the court in the *Isbrandsten* case." 170 F.Supp. 354, 365. The court then proceeded by first pointing out that *Aircoach* contained two basic holdings:

> The first related to the proper forum for decision of issues as to the procedural agreements and their connection with

Section 22 rate practices. The second dealt with the exceptional circumstances under which Sec. 5a immunity would not apply. On the first issue, the Court of Appeals held in the ACTA case that the I.C.C. and the District Court had concurrent jurisdiction to decide the intent and effect of approved procedural agreements in relation to Section 22 rates, and whether coverage by these agreements would immunize these rates from the antitrust laws.

*Id.* at 364. According to Judge Sirica, the court of appeals in *Riss* interpreted *Isbrandtsen* as modifying only the first holding of *Aircoach*. The district court concluded:

> It is the governing rule now that the issue of the intent and effect of a rate reduction, claimed to have been taken pursuant to procedures set forth *in agreements approved by the Commission* under Section 5a of the Interstate Commerce Act, must, *in a case where such issue is the sole or dominant issue*, first be referred to the Commission prior to a Court determination of whether such rate reduction violates the antitrust laws.
>
> Thus, it would appear that the second holding of ACTA [*Aircoach*] stands unaffected by *Isbrandtsen.*

*Id.*

Applying those legal principles to the case, Judge Sirica found that

> it is also clear that the intent and effect of the Section 22 rate reduction is in no sense the dominant, much less the sole, issue of this litigation. The complaint as supplemented alleges a complex conspiracy in violation of the Sherman Act. A concerted reduction in ... [rate] is alleged to have been one of the many overt

acts designed to effectuate unlawful plan.

*Id.* at 366. Based on the finding that the rate reduction issue was not the sole or dominant one, the court held that "no possible ruling as to its coverage by prior approved procedural arrangements would be conclusive for such rate reduction as alleged to be part of a conspiracy to restrain trade." *Id.* at 368. Continuing by considering the practical aspects of referral, Judge Sirica concluded that it would "be contrary to sound judicial discretion to permit [the projected] additional delay to this overpostponed litigation merely to seek an optional ruling from the Commission on the rate reduction aspect which is not the sole or dominant issue in this case." [12] *Id.*

Similarly, here, the plaintiff will seek to present a considerable body of evidence in documents, depositions, and in live testimony to show (1) the existence of a conspiracy to monopolize "the business of providing dock services for iron ore and other goods moving over docks on the lower Great Lakes;" (2) that each of the charged defendant railroads willfully became a member of the conspiracy; (3) that one or more overt acts occurred and that one or more of said overt acts were performed to accomplish the object or purpose of the conspiracy; (4) that the particular defendant under consideration acted with a specific intent to eliminate Pinney as a competitor to monopolize the business of providing dock services for the unloading of ex-lake iron ore; and (5) that as a direct and proximate result of said conspiracy, Pinney suffered injury and damage to its business or property. Since the fourth element, *i.e.,* specific intent, is only one of the elements which the plaintiff must prove, it cannot be said or determined that the intent element is either "the sole or dominant issue." [13]

---

**12.** Thereafter, petitioners were denied a writ of certiorari by the United States Court of Appeals. *Atlantic Coast Line Ry. Co. v. Riss & Co.,* 267 F.2d 659. The court concluded that it should not exercise its extraordinary jurisdiction under 28 U.S.C. § 1651, not being in the "best interest of sound judicial administration a review of this stage of the litigation the District Court's decision."

**13.** Thus, this court agrees with the statement, albeit *dicta,* of the District of Columbia Circuit in *Bessemer and Lake Erie, supra,* as expressed in n. 43, "In any event, in the case before us the 'intent and effect' of the rate filings is only one issue among several."

The court further concludes that it would not be practical to refer to the Commission to consider only the proof, isolated from the total body of plaintiff's evidence, that relates to the fourth element of specific intent. Hence, the court concludes, upon reconsideration, that the intent and effect issue should not be referred.

### B.

■ The second issue which might be referred to the Commission relates to whether defendants' actions were "in conformity with" the 5(a) agreement. In its opposition to reconsideration, Pinney argues:

> [*Atlantic Coast Line Railroad v. Riss & Co.*] makes plain that referral is appropriate only where the "sole or dominant" issue is whether an otherwise properly executed rate action is unlawful because of wrongful intent. In this case, the rates set by defendants were never approvable by the ICC because defendants did not comply with the 5a agreement.

*Id.* at 17. N & W deems this language "an apparent reference to the charges made by Pinney earlier in the case that the railroads' alleged activities were not immune regardless of intent because they were not in compliance with the procedures specified in the Eastern Railroads 5a agreement." N & W said that this "continuing dispute concerning the defendants' compliance with section 5a procedural requirements serves to heighten the need for referral in this case." N & W then urges that

> [t]he ICC is the only forum qualified to decide issues arising under the technical language of the Eastern Railroads Section 5a Agreement because it approved the very language at issue and exercised continuing supervision over the rate bureau's operations.

N & W and B & LE, in an earlier submission, rely on *Luckenbach Steamship Company, Inc. v. United States*, 179 F.Supp. 605 (D.Del.1959), *aff'd per curiam* as to the antitrust issue, 364 U.S. 280, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960), and *Canned Goods From Pacific Coast to Eastern*

*Points*, 315 I.C.C. 769, 790–92 (hereafter *Canned Goods*). Luckenbach, a general cargo carrier in the intercoastal trade, and others, filed a complaint with the ICC in which they protested the railroads' proposed tariff schedules to establish reduced commodity rates on canned goods from the Pacific coast to destinations in different areas of the country. While the Commission ordered an investigation, it denied Luckenbach's request to suspend the new rates. Charging there was a violation of the "National Transportation Policy and the Sherman Anti-trust Act," Luckenbach sought a district court injunction against the United States and certain railroads to order the Commission to suspend the proposed rates. 179 F.Supp. at 607. Luckenbach alleged that the reduction in rates was "designed (1) to monopolize the transportation of canned goods from Pacific coast origins to Atlantic coast destinations; and (2) to drive Luckenbach from the business." *Id.*

The three-judge statutory court denied the requested injunction. The court held that the Commissioner's denial of a rate suspension is by law committed to agency discretion and, therefore, not reviewable. *Id.*

With reference to *Luckenbach*'s charges that Sherman Act sections 1 and 2 were violated, the court noted that "the precise facts forming the basis of plaintiff's antitrust action are cognizable by the Commission [as] amply supported by plaintiff's showing before the Commission in the suspension proceeding." *Id.* at 611. The plaintiff had filed with the Commission its "Protest and Petition for Suspension" in which the plaintiff set forth its claims under the heading "Violation of the Antitrust Laws." Having previously acknowledged the applicability of the doctrine of primary jurisdiction, the court invited the Commission "initially to rule on the instant [antitrust] claims." "Paramount" in its determination was the fact that defendant railroads were operating pursuant to section 5a antitrust exemption agreements. Recognizing that "[s]ection 5a supersedes

the Sherman Act to the extent that the approved agreement is immunized from Sherman Act proscriptions," the court held that "since Section 5a is administered by the Commission, it is incumbent upon the court to seek the observations of the Commission with respect to the extent and scope of the exemption." *Id.* at 613. In exercising its discretion in fixing the breadth of this reference to the Commission, as seen, the court considered the factor that all of the claimed antitrust violations were already presented to the Commission.[14]

The Supreme Court's *per curiam* affirmance of the antitrust phase of the three-judge statutory court judgment was without opinion. Thus it was a summary affirmance. The Supreme Court has made clear that "the precedential effect of a summary affirmance can extend no farther than 'the precise issues presented and necessarily decided by those actions.'" *Illinois Elections Bd. v. Socialist Workers party*, 440 U.S. 173, 182, 99 S.Ct. 983, 989, 59 L.Ed.2d 230 (1979), quoting from *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). Hence, the *per curiam* summary affirmance upheld the district court's decision to seek an initial ruling. However, in the absence of an opinion, the affirmance may not be read as requiring a Commission reference each time antitrust claims are made against carriers subject to section 5a immunity. Nor may it be read as fixing the scope of referral to the Commission, pursuant to the doctrine of primary jurisdiction, as ordered in *Luckenbach*.[15]

After the *Luckenbach* court dismissed the action, Luckenbach pursued its complaint before the ICC. The ICC's subsequent report, *Canned Goods From Pacific Coast to Eastern Points, supra,* is instructive in considering the claim of defendants N & W and B & LE that section 5a matters involving the Eastern Railroads Agreement should be referred to the Commission. The Commission entered its report on March 19, 1962, taking up exceptions to the examiner's report issued after a hearing.

The Commission first took up the protestants' (Luckenbach's and others') contention that "in making the new rate the respondents violated the antitrust laws in acting outside of their joint ratemaking agreements approved by [the Commission]." The Commission found that "[a]ll of the activities upon which [Luckenbach's] claims were based were preliminary to the consideration and consummation of the adjustment finally approved, including the new rate, by the duly constituted bodies specified in the agreements;" and that the activities' "purpose was to obtain information necessary to thorough and intelligent consideration of the subject matters."

The Commission noted that "the exchange of correspondence and information by individual railroads" was "expressly provided for in the agreement." The protestants urged that the Special Canned Goods Committee was "an organization not provided for in the agreement," and "did not keep regular records of its proceedings." However, the Commission found that paragraph (c) of the agreement autho-

14. Rather than retain jurisdiction of the antitrust charges, the three-judge court dismissed the action. It followed *Far East Conference v. United States*, 342 U.S. 570, 577, 72 S.Ct. 492, 495, 96 L.Ed. 576 (1952), which held that no purpose would be served by holding the district court case in abeyance while the "proceeding before the [Federal Maritime] Board and subsequent judicial review or enforcement to its order" was being pursued. *Luckenbach*'s dismissal of the action is not a holding that the ICC had exclusive jurisdiction, since *Far East Conference* added that "a similar suit is easily initiated later, if appropriate."

15. As indicated in part IV.(A), *Riss* limited the reference to "the intent and effect of a rate reduction claimed to have been taken pursuant to procedures set forth in agreements approved by the Commission under section 5a of the Interstate Commerce Act, 49 U.S.C. § 5b" but made it mandatory "in a case where such issue is the sole or dominant issue." Because the D.C. Circuit in *Riss* in reaching its conclusions recognized that a reference under the doctrine of primary jurisdiction has discretionary aspects, 267 F.2d at 658, and *Luckenbach*'s reference, in terms of its scope, was likewise discretionary, this court finds no conflict between the holdings in *Riss* and *Luckenbach*.

rized the designation of "subcommittees" or "special committees" which were "to investigate any traffic matter before the organization and to make reports thereon." The Commission found that the committee referred to by the protestants "was one of several such subcommittees," that "its function [in reporting to the TEA]" was "solely advisory," and that the agreement did "not require that such a committee hold hearings or keep minutes of its informal conferences with shippers." The Commission concluded:

> The respondents, in making the new rate, employed procedures which are normally used in processing similar rate proposals, and which complied fully with their applicable section 5a agreements. Consequently, their action was immune from the antitrust laws, at least with respect to its collective or concerted nature.

315 I.C.C. at 792.

The Commission then considered whether the new rate constituted destructive competition and whether the proposed reduction was designed to eliminate *Luckenbach* as a competitor. After reviewing all relevant facts and circumstances, the Commission concluded:

> [N]o reasonable inference can be drawn that factors other than the normal incidents of fair competition were present, or that the respondents, by means of that rate, intended to destroy Luckenbach as a competitor.

*Id.* at 795.

Comparing one aspect of the present case against the analysis of *Canned Goods*, it is concluded that the Commission's special expertise is not needed to examine and make findings of what occurred at the numerous "informal" meetings of members of the CCIOC as reported in the several unpublished several sets of

minutes. In *Canned Goods*, the Commission's expertise was not needed to determine that "informal nonpublic meetings with shippers" held by the "Special Canned Goods Committee" had occurred. Rather, the Commission's expertise assisted in making a determination that the 5a agreement provided for this type of sub-committee and that "the agreement [did] not require that such a committee hold hearings or keep minutes of its informal conference with shippers."

However, if plaintiff intends to claim that either the Eastern Railroad's 5a agreement or the Commission's procedures or practices in administering such agreements did not provide for or permit the joint discussions and actions or proceedings, then such a claim presents a question which should initially be referred to the Commission. For example, does the plaintiff intend to charge that lack of conformity with the section 5a Eastern Railroads Agreement involved failure to give notice to affected parties, as in *Board of Trade of City of Chicago v. I.C.C.*, 646 F.2d 1187 (7th Cir.1981)?[16]

The plaintiff is directed to indicate in writing within 30 days of the date of this memorandum and order what its intentions are with reference to this matter. If plaintiff intends to make such a claim, plaintiff should so indicate. Thereupon, this court will determine whether a reference to the Commission is appropriate. If so decided, the court would confer with counsel as to the content of the reference before the court issues an order of reference to the plaintiff. The case would then be suspended while the plaintiff petitions the ICC for a section 13 investigation and report of the question.

In *Canned Goods*, the Commission concluded that the railroads' procedures in making the new rate "was immune from

---

**16.** *Board of Trade* involved an appeal from an ICC decision determining that certain tariff schedules filed by railroads were not unlawful under the Interstate Commerce Act. On review of the ICC decision by the district court, the court held

> that the railroads violated 49 U.S.C. § 10706(a)(2) [formerly section 5a of the In-

terstate Commerce Act] by failing to follow the rate-getting procedures established in the *Agreement of the Eastern Railroads Under Section 5b of the Interstate Commerce Act.*

By its review and reversal, the court recognized that the courts have authority to adjudicate whether actions comply with prescribed 5a procedures.

the antitrust laws, at least with respect to [their] collective or concerted nature." Otherwise, the Commission did not attempt to analyze or adjudicate the several elements [17] of *Luckenbach*'s antitrust conspiracy charge. Nor could they have adjudicated the antitrust conspiracy charge. As expounded in *McLean Trucking Co. v. United States*, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944):

> [T]he Commission has no power to enforce the Sherman Act as such. It cannot decide definitively whether the transaction contemplated constitutes a restraint of trade or an attempt to monopolize which is forbidden by the Act. The Commission's task is to enforce the Interstate Commerce Act and other legislation which deals specifically with transportation facilities and problems.

*Id.* at 79, 64 S.Ct. at 376. Since the Commission does not have the power to address and adjudicate plaintiff's antitrust claim, this court will not refer the entire claim to the ICC. Nevertheless, with respect to the issues itemized above, observance of the doctrine of primary jurisdiction, as explicated in *United States v. Western Pacific, supra,* and other cited cases, warrants reference of those issues in the event the plaintiff intends to make the identified claims.[18]

### C.

N & W insists that "[t]he need for referral [to the ICC] is made all the more com-

pelling in this case because the railroads are alleged to have acted with the intent to eliminate Pinney as a competitor in a market where all transportation was affected by the pervasive regulatory policies of that agency." As noted, the Transportation Act of 1920, adding section 15a to the Interstate Commerce Act, authorized the Commission to fix minimum rates. Previously the Commission could only prescribe maximum rates as it did in the *Iron Ore Rate* cases. Reviewing a number of cases, N & W contends that "[t]he ICC's administration of section 15a created a clear conflict between the goals of the Interstate Commerce Act and those of the antitrust laws, which had not existed prior to enactment of that statute."

B & LE reviews the same cases as well as some other ICC decisions. It mentions changes in ICC policies resulting from the addition of section 15a to the Act. Should this court on reconsideration adhere to its ruling regarding the *Keogh* doctrine and express section 5a immunity, B & LE asks this court to "avail itself of the expertise of the agency charged with administering the regulatory standards under which defendants operated before condemning defendants' challenged rate activity as unlawful under the antitrust laws." [19] Following its survey of "relevant regulatory law," B & LE submits

> that the alleged restrictive line haul tariffs as well as defendants' alleged main-

**17.** Those elements would have included existence of a conspiracy to monopolize the affected business, membership of the defendants in such conspiracy, occurrence of one or more overt acts in furtherance of the conspiracy, predatory intent to destroy the business of Luckenbach, injury to the business or property of Luckenbach directly resulting from a conspiracy to violate the Sherman Act.

**18.** In part IV, the court has reviewed the doctrine of primary jurisdiction to the extent applicable. *American Commercial Barge Line Cl. v. Eastern Gas & Fuel Assn.,* 204 F.Supp. 451 (S.D. Ohio 1962), cited by N & W, applies the doctrine of primary jurisdiction. See also, *Hansen v. Norfolk & Western R.R. Co.,* 689 F.2d 707 (7th Cir.1982).

However, as Pinney notes, *American Commercial Barge Line* appears to involve the applica-

tion of 49 U.S.C. § 5(11), rather than 49 U.S.C. § 5b(9). *Brotherhood of Loc. Eng. v. Chicago & Northwestern Ry. Co.,* 314 F.2d 424, 431 (8th Cir.1963), indicates what the language plainly states that "§ 5(11) confer[s] exclusive and plenary jurisdiction upon the ICC to approve mergers and relieving the carrier from all other restraints of federal law." Hence, *American Commercial Barge Line* is not apposite, in any event.

**19.** The principal cases cited by the defendants are *Trunk-Line & Ex-Lake Iron Ore Rates,* 69 ICC 589 (1922); *Wharfage Charges at Atlantic and Gulf Ports,* 157 ICC 663 (1929); *U.S. Phosphoric Products Corporation v. Atlantic Coast Line Railroad Company,* 206 ICC 411; *Lake Coal Demurrage,* 232 ICC 735 (1939); and *United States v. Interstate Commerce Commission,* 352 U.S. 158, 77 S.Ct. 241, 1 L.Ed.2d 211 (1956).

tenance of a uniform handling charge structure—and defendants' alleged intent in doing so—would indeed very likely have been held lawful under the Interstate Commerce Act, notwithstanding that they may not have conformed to the competitive norm of the antitrust laws.

B & LE's and N & W's review of "relevant regulatory law" indicate that the Interstate Commerce Commission has repeatedly ruled in favor of railroad carriers where private docks have complained to the Commission that rail carriers engaged in discriminatory or unreasonable conduct in violation of the Interstate Commerce Act. But these cases do not present and have not dealt with issues arising under the antitrust laws.

Referring to the policies reflected in the decisions set forth by N & W in both its reconsideration brief and appendix, N & W asserts that the "ramifications of those policies continue to affect the carriers' behavior throughout the period of alleged conspiracy." N & W concludes that "this court should not assume that the railroad's intent toward Pinney can be accurately ascertained without reference to the Commission's expertise in regulating the relevant market."

To the extent that B & LE and N & W may be asking this court to refer to the Commission for findings as to defendants' intent in connection with whether the defendants violated the Interstate Commerce Act by their alleged conduct, this court concludes that such issue should not be referred; such intent is not an issue in this case. The issues before this court do not directly involve whether or not defendants, by their alleged conduct, violated the Interstate Commerce Act.

However, if the defendants are asking that this court refer the issue of intent to violate the Interstate Commerce Act in connection with their request to refer the issue of predatory intent to eliminate Pinney as a competitor, the court has previously indicated its reasons for not referring the latter issue.

### V.

B & LE moves for reconsideration of this court's ruling on Pinney's standing to raise certain claims. B & LE has not challenged Pinney's standing to complain of defendants' alleged actions restricting line haul rates on iron ore. Rather, B & LE in its original motion challenged Pinney's standing to complain of an alleged conspiracy by defendants: to restrain the business of providing water carriage for iron ore and of building ships for such carriage; to maintain the same dock handling charges for bulkers and self-unloaders; and to monopolize the business of providing land transportation for iron ore and other goods moving over the lower Great Lakes docks.

In its jurisdiction order, this court disagreed with all of B & LE's challenges to Pinney's standing except for Pinney's allegations regarding monopolization of land transportation. With respect to the land transportation issues, the court agreed that Pinney was not the proper party to raise such allegations since the "alleged conspiracy to monopolize the land transportation of iron ore presents legal and factual issues wholly distinct from those generated by the alleged conspiracy to monopolize dock services." Jur.Op. at 62. However, the court also stated that plaintiff is entitled to prove that "a group boycott of its dock effectively precluded it from competing with defendants" and that "defendants conspiratorially harassed it in its attempts to truck iron ore from its dock, subject to the limitations imposed by *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, [81 S.Ct. 523, 5 L.Ed.2d 464] (1961)." *Id.* at 62–63.

In its motion for reconsideration, B & LE first argues that the court analyzed Pinney's standing to sue solely in terms of its allegation regarding commodity line haul rates on iron ore. Next, questioning in particular Pinney's standing to complain of the "handling charge issue," B & LE asks the court "in accordance with the teaching of *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, [513 F.Supp. 1100 (E.D.Pa.1981)], to substantively address

Bessemer's motion to dismiss certain of Pinney's claims for lack of standing under § 4 of the Clayton Act." In a letter to the court dated January 13, 1984, B & LE acknowledged its previous reliance on *Zenith* and noted that *Zenith* was affirmed in part and reversed in part by the Third Circuit in *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238 (1983), but indicated that their argument is not undercut by the partial reversal.

B & LE's argument that the court addressed Pinney's standing "solely" in terms of the alleged restrictions on commodity line haul rates is without merit. Indeed, as B & LE notes in footnote three of its letter, this court "did hold that Pinney lacked standing to complain that defendants conspired to eliminate competition in and monopolize the business of land transportation for iron ore and other goods moving over docks on the lower Great Lakes." Given this holding, it is obvious that the court did not address Pinney's standing solely in terms of the commodity line haul rate issue.

The Third Circuit's decision in *Japanese Electronic* does not support B & LE's arguments with respect to standing. In that case, the plaintiffs were two United States manufacturers of television receivers who alleged that Japanese manufacturers of similar products engaged in a conspiracy to eliminate United States competitors by keeping prices artificially high in Japan and low in the United States. As part of the conspiracy to sell at artificially low prices in the United States, plaintiffs alleged that defendants entered an agreement which established minimum prices for television receivers sold for export. The district court held that plaintiffs did not have standing to complain of alleged minimum price agreement regarding exports to the United States because the plaintiffs could not have been injured by such agreement. The district court reasoned:

> It is self-evident that an agreement which places a floor under the price one's competition can charge keeps the price up, leaving one free to compete above

that price. While injuring the consumer, such an agreement cannot injure the competitor.

*Zenith*, 513 F.Supp. at 1160.

On appeal, the Third Circuit reversed the district court on the issue of plaintiff's standing to complain of the minimum price agreement. The appellate court agreed that if the minimum price agreement were viewed alone, plaintiffs would not have standing to bring this claim:

> Since, however, the effect of a horizontal agreement among manufacturers to set minimum prices would in isolation protect non-party competitors like NUE and Zenith from competition, they could not, absent other circumstances, bring a section 4 suit because they could not show the requisite injury to their business or property.

*Japanese Electronics, supra,* at 310. Nevertheless, the appellate court examined evidence of "other circumstances" suggesting that plaintiffs may have been injured "from what they refer to as an export cartel." *Id.* The court first noted that

> there is evidence from which a fact-finder might conclude that the minimum prices agreed upon were in fact dumping prices.... The collusive establishment of dumping prices could support an inference of collective predatory intention to harm American competitors.

*Id.* The court then noted other evidence which would permit inferences of predatory pricing, of efforts to conceal activities and of a horizontal price-fixing agreement. The court concluded:

> Thus a fact-finder might reasonably infer that the allocation of customers in the United States, combined with price-fixing in Japan, was intended to permit concentration of the effects of dumping upon American competitors while eliminating competition among the Japanese manufacturers in either market.

*Id.* Thus, the Third Circuit held that a finding of a conspiracy to sell at artificially high prices in Japan and, at the same time, minimum low prices in the United States, would support liability under section 4 of

the Clayton Act, assuming plaintiffs could show they were in fact damaged.

In reversing the district court's decision with respect to standing, the Third Circuit did not evaluate one part of the conspiracy "in isolation," but rather considered all the evidence from the "export cartel." B & LE, in an attempt to use *Japanese Electronic* to support its argument, contends:

> The court of appeals did not question the ruling below that plaintiffs' standing to seek antitrust recovery must be separately analyzed as to discrete aspects of an alleged unitary conspiracy. Rather, the court of appeals itself undertook such analysis.

Respectfully, this court disagrees. The Third Circuit did not merely question an analysis which separates parts of an alleged conspiracy and ignores other relevant circumstances, but the court reversed on this very issue. Moreover, in the instant case, as this court concluded in its jurisdiction order, the alleged conspiracy to maintain dock handling charges in order to discourage the development of self-unloaders "relates directly to plaintiff's claim that defendants sought to eliminate its competition in the dock handling of ex-lake iron ore." Jur.Op. at 61.

In its most recent submission, B & LE also relies on *In re Wheat Rail Freight Rate Antitrust Litigation*, 579 F.Supp. 510 (N.D.Ill.1983). In that case, defendant railroads counterclaimed against plaintiff shippers alleging that the railroads were victims of collusive action by the shippers to increase the shippers' profits in violation of the Sherman Act. Defendants' counterclaim alleged that the shippers established a "base point pricing" system which enabled them to charge phantom freight charges to their customers. The counterclaim also alleged a conspiracy to hold down freight costs on wheat and wheat products in various ways. In short, the railroads were complaining of a "two-headed conspiracy," where shippers tried to increase profits by keeping the freight costs

they charged their buyers up and those paid to the railroads down.

The court in *Wheat Rail* considered the standing of the railroads to complain of the base-point pricing system. The court stated:

> When the present motions to dismiss were filed, nothing suggested that the railroads were purchasers of wheat products subject to the base point pricing system. Thus, the shippers pointed out that to the extent that the railroads' counterclaims were *aimed at that system alone*, the railroads were harmed only indirectly and that the only proper plaintiffs to raise such a claim would be the buyers themselves. We agree. *See Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 908–13, 74 L.Ed.2d 723 (1983) (person not a consumer or competitor in the market in which trade was restrained cannot bring antitrust claim).

Slip Op. at 512 (emphasis added). The court then noted that in response to the motions, the railroads disclaimed any intention to attack the base-point pricing system. With respect to the other allegations, the court applied the standards for antitrust standing set forth in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), and held that the railroads met those standards. The court stated:

> Their claim involves a conspiracy alleged to be directed purposefully at them that deprives them of freight revenues that they would receive absent the conspiracy; they are competitors in the market in which trade was restrained, that is, the market for the purchase of rail freight services though proof of the exact measure of damages may involve difficult concepts, the fact of damage is not speculative of the railroads' allegations are true; and apart from certain considerations that we will discuss below there

is no risk of complex apportionment or duplicative recovery.

Slip Op. at 513 (footnotes omitted).

Unlike the dock handling charge allegations here, the "base point pricing" allegations that were disregarded by the court in *Wheat Rail* for lack of standing were not directly related to the railroads' alleged injury. The base-point pricing system was directed at the customers of the shippers, not the railroads. In contrast, as previously noted, in the instant case the dock handling charge allegations relate directly to the injury allegedly sustained by Pinney. These allegations are an integral part of the conspiracy that Pinney alleges to be "directed purposefully at them" and that deprived them of revenues that they would have received absent the conspiracy.

After reconsideration, this court reaffirms the rulings it made on the standing issues as set forth in the jurisdiction order.[20]

### VI.

The court has prepared a ruling on the defendants' alternative request for certification for an immediate appeal under 28 U.S.C. § 1292(b). However, the plaintiff's responses to the inquiries propounded in parts II and IV may affect the content of the certification memorandum and even the final resolution of the certification question. In any event, by propounding the inquiries to plaintiff, the court thereby delays the ripeness of the time of filing the ruling on the certification request. Hence, the court defers filing the certification ruling.

Subject to the court's orders in parts II and IV, the court overrules motions for reconsideration of its jurisdictional memorandum and order of June 21, 1983.

IT IS SO ORDERED.

20. In *Meyer Goldberg, Inc. of Lorain v. Goldberg,* 717 F.2d 290 (6th Cir.1983), the Sixth Circuit noted that in *Southhaven Land Co., Inc. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1086 (6th Cir.1983), the court "resolved 'to consider, henceforth, the § 4 inquiry on a case by case basis by applying the criteria defined in *Associated General Contractors.*'" In passing on the "standing" issue raised by B & LE, this court adopted that approach.